FILED
COURT OF APPEALS
DIVISION II

2015 JUN 16 AM 8: 30

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44968-4-II |
| Respondent, | PUBLISHED OPINION |
| v. | |
| EUGENE V. ELKINS, JR., | |
| Appellant. | |

SUTTON, J. — Eugene V. Elkins Jr. appeals his jury trial conviction for second degree felony murder predicated on his assault of the victim. He argues that (1) the trial court erred when it denied his motion to suppress three sets of statements that he made to law enforcement officers after he asserted his right to silence or right to counsel, (2) the trial court erred when it denied his motion for a mistrial after a deputy commented on Elkins' exercise of his right to counsel and right to silence, and (3) the second degree felony murder statute, RCW 9A.32.050(1)(b), is unconstitutionally vague when the predicate felony offense is the assault of the same victim. We hold that whether the officers have scrupulously honored the defendant's right to silence and right to counsel under *Miranda*[1] must be determined on a case-by-case basis and that there is no bright-

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

line rule requiring law enforcement officers to fully readvise previously *Mirandized* suspects when reinitiating interrogation. We further hold that the trial court did not err in admitting Elkins' statements, that any comment on Elkins' right to counsel was harmless, and that the second degree felony murder statute is not vague. Accordingly, we affirm.

FACTS

I. BACKGROUND

A. Murder, Flight, and Arrest

At about 3:00 AM on the morning of June 6, 2012, one of Elkins' neighbors in the mobile home park in which Elkins resided heard "some awful rattling and clanking" and a woman screaming from the area of Elkins' trailer. 2 Verbatim Report of Proceedings (VRP) at 273. The noise lasted for 15 to 20 minutes.

At about 4:00 AM, Elkins left a voice mail on his friend Brianne Elaine Slosson's phone asking her to contact him about something important. Approximately three and a half hours later, Slosson contacted Elkins. He first told Slosson that his girlfriend Kornelia Engelmann was dead and that Slosson should "keep [her] mouth shut." 2 VRP at 246, 248. Elkins then said that he was not sure if Engelmann was dead and told Slosson, who was a certified nursing assistant, that he wanted her to come over and check on Engelmann. Slosson immediately went to Elkins' home.

She found Engelmann laying face up on the bedroom floor; Engelmann was dead. Slosson could see that Engelmann was black and blue from the chest up. When Slosson asked Elkins if he had done this to Engelmann, he responded that he had beaten her but that she was fine when she went to bed around midnight. He also said that she must have fallen when she got up to use the bathroom.

2

Elkins then left, telling Slosson to give him a 10 minute head start before she called 911 and to tell the police that he had gone to Oregon. As soon as he left, Slosson called 911. Several deputies arrived and verified that Engelmann was dead.[2]

That afternoon, Elkins arrived unexpectedly at a friend's house in Wapato. He told his friend that Engelmann was not alive despite his efforts to revive her, so he got scared and left. He also told his friend that he had "shoved [Engelmann] around" but that he had not hit her. 2 VRP at 283. Elkins also denied having killed Engelmann. Yakima County deputies arrived around an hour later and arrested Elkins.

At about 3:30 PM, the Yakima County deputies advised Elkins of his *Miranda* rights. Elkins declined to make a statement, and the Yakima County deputies did not question him further.

## B. June 6 Interview

That evening, Sergeant Don L. Kolilis and Detective Keith A. Peterson from the Grays Harbor County Sheriff's Office arrived in Yakima. The Yakima County deputies told Kolilis and Peterson that Elkins had been advised of his rights and had not wanted to speak to the Yakima County deputies.

Kolilis and Peterson interviewed Elkins at about 8:30 PM. Although they did not readvise Elkins of his *Miranda* rights, Kolilis and Peterson asked Elkins if he had been advised of these rights, if he remembered them, and if he understood those rights were still in effect. After Elkins

---

[2] A forensic pathologist later testified about Engelmann's numerous injuries and concluded that she had died of internal bleeding caused by multiple blunt force injuries to her head, chest, and abdomen inflicted over a short period of time. He opined that death would have occurred within four or five hours of the injuries.

confirmed that he recalled being advised of his *Miranda* rights and that he understood those rights were still in effect, Elkins agreed to talk to the deputies.[3]

During this interview, Elkins told the deputies that he and Engelmann had gotten into an argument the Friday[4] before her death because he believed that she had been flirting with another man and that this argument had escalated into "pushing, shoving and continued on." 3 VRP at 459, 493. Elkins explained that during this altercation, Engelmann scratched him and he hit her "quite a few times" with an open hand. 2 VRP at 460. When the deputies commented on the extensive bruising on Engelmann's body and asked Elkins if he had kicked her, hit her with something, or hit her with a closed fist, Elkins said that he did not want to talk to the deputies any longer and requested an attorney. The deputies ended the interview.

### C. Statements during Transit and June 7 Interview

The next day, Kolilis transported Elkins back to Grays Harbor County. During the drive, Kolilis engaged Elkins in small talk.[5] Towards the end of the drive, Elkins told Kolilis that he wanted to talk about what had happened and about some guns he (Elkins) may have taken with him from his home. Kolilis told Elkins to wait until they arrived at the sheriff's office and they could properly advise him of his *Miranda* rights. After arriving at the Grays Harbor sheriff's

---

[3] At the later suppression hearing, Kolilis testified that Elkins was not handcuffed during the interview, that the deputies did not threaten or make any promises to Elkins, and that the general tone of the interview was "conversational" as opposed to confrontational. 1 VRP at 29-31. Peterson testified that they did not make any promises or threats and that the interview was "very relaxed" and Elkins appeared "lucid" and seemed to understand everything the deputies were saying. 1 VRP at 66-67.

[4] June 1, 2012.

[5] At the suppression hearing, Kolilis admitted to having started the conversation during the drive from Yakima to Grays Harbor County, but he denied asking Elkins any questions during the drive.

office, being readvised of his *Miranda* rights,[6] and signing a written waiver of these rights, Elkins gave a written statement.

In his signed statement, Elkins admitted to having had a physical altercation with Engelmann on June 1, during which he struck her with a closed fist several times, knocked her down at least once, and caused "bad" bruising. Ex. 74 at 2. The next day, they were both hung over, he was scratched, and she was bruised. But neither of them complained other than to say they "felt like hell." Ex. 74 at 3. Engelmann put ice on her face. But they did not go to the hospital because Engelmann had warrants and Elkins "knew there would be trouble if we went to the hospital," and Engelmann never asked to go. Ex. 74 at 3.

Elkins further stated that on the night before Engelmann died, they had been drinking and they had a nonphysical fight. Engelmann went into the bedroom; Elkins remained in the living room where he watched television and drank. Later, Elkins found Engelmann on the bedroom floor. After trying to administer cardiopulmonary resuscitation for "what felt like 1 hour," he realized she was dead. Ex. 74 at 4. He was frightened and did not call 911 because he "knew what it would look like." Ex. 74 at 6.

Elkins admitted that he had contacted Slosson and told her to come over to check on Engelmann and that he had told Slosson that he "thought" he had killed Engelmann. Ex. 74 at 5. When Slosson arrived, she verified that Engelmann was dead. He then left, telling Slosson to give him a 10 minute head start. Elkins then drove to his friend's house and told his friend that Engelmann was dead. They shared a beer and the police arrived. Elkins stated that he left because

---

[6] At the suppression hearing, Kolilis testified that he specifically addressed Elkins' previous request for counsel, that he explained to Elkins that they were reading him his *Miranda* rights again because he had already asked for counsel, and that they wanted to be sure that he understood what he was doing.

he wanted time to mentally prepare himself because he knew he would be going to prison. He also stated that he regretted the drinking, fighting, arguing, and hitting, and that he wished he had died rather than Engelmann. He stated, "I truly loved her and will live with this every day for the rest of my life." Ex. 74 at 6.

## II. PROCEDURE

The State charged Elkins with second degree felony murder predicated on his assault of Engelmann.[7] The case proceeded to a jury trial.

### A. Motion to Suppress

Before trial, Elkins moved to suppress the statements he made to the Grays Harbor County deputies on June 6 and June 7. Defense counsel told the trial court that Elkins was not challenging the admission of any statements he made while being transported from Yakima to Grays Harbor County because those statements were not the result of an interrogation. At the suppression hearing, the Yakima County and Grays Harbor County deputies testified as described above.

In addition, on cross-examination, defense counsel asked Kolilis whether he had engaged in "small talk" with Elkins on the drive from Yakima to Grays Harbor County in hope that Elkins would give a statement or say something incriminating. 1 VRP at 50-51. Kolilis answered that was not his intent and that he was talking to Elkins only because it was a long drive. But Kolilis also stated, "And, you know, do—do I always hope that people come forward and be truthful? That is my hope on all occasions. So I guess what you're saying is partly right." 1 VRP at 51.

The trial court gave a lengthy oral ruling setting out its factual findings of fact and conclusions of law and admitted all of Elkins' statements.[8]

---

[7] RCW 9A.32.050(1)(b).

[8] We discuss the relevant findings in more detail below.

B. Trial Testimony and Mistrial Motion

At trial, the State's witnesses testified as described above, although they generally did not comment about when or whether Elkins asserted his *Miranda* rights. Elkins did not present any witnesses. The trial court also provided the jury with a redacted copy of Elkins' June 7 written statement, also as described above.

Kolilis, however, did testify that he and Peterson had ended the June 6 interview when Elkins requested an attorney after the deputies asked him if he had hit Engelmann with something, kicked her, or hit her with a closed fist. Elkins objected to this testimony and moved for a mistrial. The trial court denied the motion for a mistrial but instructed the jury to disregard that statement.

The jury found Elkins guilty of second degree felony murder. Elkins appeals. He argues that the trial court erred in denying his motion to suppress his statements and motion for mistrial and that the felony murder statute is unconstitutionally vague as applied to him.

ANALYSIS

I. DENIAL OF SUPPRESSION MOTION

Elkins first argues that the trial court erred when it denied his motion to suppress (1) the June 6 statements he made to Peterson and Kolilis in Yakima, (2) the statements he made to Kolilis while being transported, and (3) the June 7 statements he made in Grays Harbor County. We disagree.

We acknowledge that fully readvising a suspect of his *Miranda* rights is clearly the best practice when resuming questioning of a suspect who has asserted his right to silence. But we hold that there is no bright-line rule that law enforcement officers must always fully readvise a defendant of his or her *Miranda* rights and that whether a defendant's rights have been scrupulously honored must be determined on a case-by-case basis.

Under these facts, the deputies' subsequent questioning of Elkins was permissible without a readvisement of his *Miranda* rights because his right to cut off questioning was scrupulously honored. There were no further words or actions amounting to interrogation before the officers obtained a waiver, the officers did not engage in any coercive tactics, and Elkins' subsequent waiver was knowing and voluntary.

## A. Standard of Review

Although the trial court did not enter written findings of fact and conclusions of law as required by CrR 3.5(c), it made detailed oral findings of fact and conclusions of law that are sufficient to allow review.[9] *State v. Thompson*, 73 Wn. App. 122, 130, 867 P.2d 691 (1994). We review these oral findings and conclusions to determine whether substantial evidence in the record supports the findings and then we determine whether those findings support the trial court's conclusions of law. *State v. Hughes*, 118 Wn. App. 713, 722, 77 P.3d 681 (2003), *review denied*, 151 Wn.2d 1039 (2004). Unchallenged findings are verities on appeal. *Hughes*, 118 Wn. App. at 722. We review de novo issues of law. *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

## B. June 6 Statements

Elkins argues that the trial court should have suppressed the statements he made to the Grays Harbor County deputies when they interviewed him in Yakima on June 6. Relying on *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), and *State v. Brown*, 158 Wn. App. 49, 240 P.3d 1175 (2010), *review denied*, 171 Wn.2d 1006 (2011), he contends that the June 6 statements were not admissible because he had already asserted his right to silence and the

---

[9] Neither party argues that we cannot review the oral findings and conclusions of law.

Grays Harbor County deputies failed to readvise him of his *Miranda* rights and obtain an "express waiver of those rights" before questioning him. We disagree.

Once "an individual 'indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *State v. Wheeler*, 108 Wn.2d 230, 237, 737 P.2d 1005 (1987) (quoting *Miranda*, 384 U.S. at 473-74). Law enforcement officers may, however, resume questioning under certain circumstances even if the defendant has asserted his right to silence. *Wheeler*, 108 Wn.2d at 238.

The test for determining whether a defendant's statements to law enforcement officers are admissible once the defendant initially asserts his right to silence or right to counsel was succinctly stated in *State v. Mason*:[10]

> The admissibility of a confession obtained after the assertion of *Miranda* rights depends on whether the request was "scrupulously honored." [*Mosley*, 423 U.S. at 104]; *State v. Boggs*, 16 Wn. App. 682, 559 P.2d 11[, *review denied*, 88 Wn.2d 1017] (1977). A per se prohibition of any further interrogation, once an accused has asserted his right to counsel, has been rejected in this state. Further questioning of a suspect is allowed provided the following conditions exist: (1) the right to cut off questioning was scrupulously honored; (2) the police engaged in no further words or actions amounting to interrogation before obtaining a waiver or assuring the presence of an attorney; (3) the police engaged in no tactics which tend to coerce the suspect; and (4) *the subsequent waiver was knowing and voluntary. State v. Pierce*, 94 Wn.2d 345, 618 P.2d 62 (1980)[, *overruled in part on other grounds by Edwards v. Arizona*, 451 U.S. 477, 482, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) (addressing whether law enforcement officers can recontact a defendant after that defendant has asserted his or her right to counsel)].

31 Wn. App. 41, 44-45, 639 P.2d 800 (1982) (emphasis added); *see also Wheeler*, 108 Wn.2d at 238. We also look at whether there was a significant passage of time before the law enforcement

---

[10] We note that this test is characterized in the Washington Practice as a "totality of the circumstances" test requiring a showing that "the defendant voluntarily waived his rights at this subsequent interrogation." 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE & PROCEDURE § 3312, at 867 (3d ed. 2004).

officers attempted to reinitiate interrogation because the passage of time weighs in favor of finding that a defendant's rights have been scrupulously honored. *See State v. Boggs*, 16 Wn. App. 682, 687, 559 P.2d 11 (1977). If the defendant has not yet requested counsel, however, there is no requirement that law enforcement officers cannot resume questioning unless counsel is present. *State v. Wheeler*, 43 Wn. App. 191, 200 n.2, 716 P.2d 902 (1986) (noting that the court in *Mosley* stated that the court in *Miranda* distinguished the procedural safeguards triggered by a request for counsel and a request to remain silent and had required interrogation to cease until counsel was present only if the accused had in fact requested counsel), *aff'd*, 108 Wn.2d 230 (1987).

Elkins does not challenge the trial court's oral findings that before the Grays Harbor County deputies interviewed him on June 6, (1) the Yakima County deputies had advised him of his *Miranda* rights, (2) Elkins fully understood those rights, stated that he understood those rights, and chose to exercise his right to silence at that time, (3) the Yakima County deputies immediately honored Elkins' request and did not attempt to further question him, (4) the Yakima County deputies informed the Grays Harbor County deputies that Elkins had been advised of his rights, (5) approximately five hours after Elkins was first advised of his rights, the Grays Harbor County deputies asked him if he recalled his rights, (6) Elkins confirmed that he recalled his rights, (7) Elkins further said that he understood that those rights were still in effect, (8) the Grays Harbor County deputies did not coerce or trick Elkins in any way, and (9) Elkins agreed to talk to the deputies. Thus, the questions we must now answer are, first, whether there is a bright-line rule that the Grays Harbor County deputies were required to fully readvise Elkins of his *Miranda* rights or whether we must instead examine Elkins' later waiver under a totality of the circumstances analysis, and, second, if there is no bright-line rule, whether the trial court's findings were

10

sufficient to establish that Elkins knowing and voluntarily waived his *Miranda* rights before the June 6 interview.

### 1. Readvisement of Rights

Elkins argues that under *Mosely* and *Brown*, the Grays Harbor County deputies were required to fully readvise him of his *Miranda* rights before interviewing him on June 6. We disagree.

In both *Mosley* and *Brown*, the law enforcement officers fully readvised the defendants of their *Miranda* rights before reinitiating interrogation. Thus, even though *Brown* contains language stating that officers must "provid[e] a fresh set of *Miranda* warnings before resuming the interrogation," 158 Wn. App. at 59 (citing *Mosley*, 423 U.S. at 104-06), neither *Mosley* nor *Brown* had reason to address whether other means of ensuring that a defendant's waiver of his rights was knowing and voluntary were sufficient because the defendants were fully readvised of their rights. Accordingly, *Mosley* and *Brown* are not controlling here.

We acknowledge, however, that our decision in *Boggs* may suggest that a full readvisement of the *Miranda* rights is required before law enforcement officers can reinitiate questioning after the defendant has asserted his right to silence. *Boggs*, 16 Wn. App. at 687. We stated in *Boggs*:

> It is our opinion that the factors which caused the court in *Mosley* to conclude defendant's rights had been "scrupulously honored" were [(1)] that the police had ceased interrogation immediately upon the defendant's exercise of his rights, [(2)] that they resumed their interrogation only after the passage of a significant period of time, and [(3)] that *subsequent interrogation was preceded by a reiteration of the Miranda rights*. . . . In the instant case defendant's *Miranda* rights were not repeated prior to his allegedly responding to the deputy's remarks with incriminating statements. *When a person has chosen to remain silent, we think, and Mosley seems to indicate, that the Miranda warnings must be readministered before law enforcement agencies can recommence interrogation.* To permit otherwise would enable the police to convey the impression that any previous assertion of the right to remain silent was merely a technical obstacle requiring only token observance before questioning could resume. On the other hand, *to readvise*

11

*the individual of his Miranda rights demonstrates that his earlier decision to remain silent has been recognized by the police, and also reminds the individual that he can continue to exercise those rights.* This is not to say the individual could not by his own voluntary and unsolicited action waive a previous exercise of his constitutional rights without first having the *Miranda* warnings reread to him. . . . That situation differs factually from one in which the state is responsible for reinitiating the interrogation process. *When the police either reopen a formal interrogation or solicit a response from a defendant in some other way, such statements will be admissible only if they were preceded by the Miranda warnings.*

16 Wn. App. at 687 (citations omitted) (emphasis added).

Although *Boggs* suggests that full readvisement of *Miranda* rights might be required, the facts in *Boggs* were also very different from the facts here. In *Boggs*, the law enforcement officer reinitiated interrogation during a casual conversation without any mention of Boggs's *Miranda* rights and did not verify that Boggs understood his rights or that he understood those rights were still in effect.[11] *Boggs*, 16 Wn. App. at 684. Here, in contrast, although the Grays Harbor County deputies did not fully readvise Elkins of his rights on June 6, they verified that he understood those rights and understood they were still in effect, and they reminded Elkins that he could continue to exercise those rights. By proceeding in this fashion, the law enforcement officers avoided the issues raised in *Boggs*. Thus, we do not find *Boggs* determinative.

As noted above, the test described in *Mason* allows for subsequent questioning if the defendant's right to cut off questioning was scrupulously honored, there were no further words or actions amounting to interrogation before officers obtained a waiver, the officers did not engage

---

[11] In *Boggs*, deputies advised Boggs of his *Miranda* rights on a Friday and then questioned him several times over the course of a weekend. 16 Wn. App. at 683-84. On at least two occasions he refused to answer questions and requested counsel. 16 Wn. App. at 684. On Sunday, Boggs and a deputy were engaging in casual conversation while the deputy was escorting Boggs back to the jail after Boggs made a phone call. 16 Wn. App. at 684. During this conversation, the deputy suggested "it would be helpful if the defendant could clear up a couple of unresolved matters in connection" with the crime. *Boggs*, 16 Wn. App. at 684. This time Boggs responded. 16 Wn. App. at 684. But at no time during this conversation did the deputy confirm that Boggs knew and understood his rights or that Boggs understood that his rights were still in effect.

in any coercive tactics, and the subsequent waiver was knowing and voluntary. *Mason*, 31 Wn. App. at 45. Similarly, *Boggs* suggests that the key concern is that the defendant understand his rights and that he also understand that those rights were still in effect, which is necessary for a knowing and voluntary waiver. *Boggs*, 16 Wn. App. at 687.

The facts here show that (1) the Yakima deputies ceased questioning Elkins immediately when he asserted his right to silence, (2) no law enforcement officer attempted to interrogate Elkins for a significant period of time, five hours, before his subsequent contact with the Grays Harbor County deputies, (3) no law enforcement officer engaged in any coercive tactics, and (4) the Grays Harbor County deputies did not interrogate Elkins until after they confirmed that he had been read his rights, that he recalled those rights, and that he understood those rights were still in effect. Although the record does not show that the Grays Harbor County deputies fully readvised Elkins of his *Miranda* rights on June 6, Elkins does not direct us to any case involving a situation such as the one here, where the defendant was advised of and previously asserted his right to silence and, although the law enforcement officers did not fully readvise the defendant of his *Miranda* rights before reinitiating the interrogation, they ensured that he understood his rights and that those rights were still in effect at the time of the officers' later contact with him. Nor have we been able to locate any such case.

The main focus in *Mosley, Brown, Mason*, and *Boggs* is that the subsequent waiver is knowing and truly voluntary. Although a full readvisement of *Miranda* rights is undoubtedly the best way to ensure a defendant's waiver is knowing and voluntary, there are other ways to achieve this. Given this, we hold that there is no bright-line rule that law enforcement officers must always fully readvise a defendant of his or her *Miranda* rights, and whether a defendant's rights have been scrupulously honored must be determined on a case-by-case basis. When, as was the case here,

13

the other three factors enumerated in *Mason* are met, the subsequent interrogation is proper if the State has shown that the defendant knowingly and voluntarily waived those rights given the totality of the circumstances, not whether the subsequent contact was preceded by law enforcement fully readvising the defendant of his or her *Miranda* rights.[12] When this and the other factors described in *Mason* are met, the officers have scrupulously honored the defendant's rights.

### 2. Knowing and Voluntary Waiver

We now turn to whether Elkins' June 6 waiver was knowing and voluntary under the circumstances here. We hold that it was.

When the Grays Harbor County deputies contacted Elkins on June 6, he had previously been advised of his *Miranda* rights that same day, and he had chosen to exercise his right to silence, thus demonstrating that he understood his rights. The Grays Harbor County deputies verified that Elkins had been advised of his *Miranda* rights and that he had understood those rights. And, importantly, they verified that he understood that these rights were still in effect. There was also no evidence that the deputies threatened or tricked Elkins into talking to them. We agree with the trial court that these facts establish a knowing and voluntary waiver of Elkins' right to silence before the June 6 interview and hold that the trial court did not err in admitting Elkins' June 6 statements.[13]

---

[12] We acknowledge that fully readvising a suspect of his *Miranda* rights is clearly best practice and would lessen the concern that the suspect did not knowingly waive his or rights.

[13] We acknowledge that *Mosley* also considered that the officers had questioned the defendant about a different offense when they reinitiated questioning and that the deputies here reinitiated questioning about the same offense. *Mosley*, 423 U.S. at 106; *see also* Br. of Appellant at 14 (arguing, without citation to authority, that any violation of his right to silence was aggravated by the fact the deputies questioned him about the same offense). But we do not consider this fact dispositive given the other facts establishing a knowing and voluntary waiver of Elkins' right to silence. *See State v. Robbins*, 15 Wn. App. 108, 110, 547 P.2d 288 (1976) (similarly holding that

Our conclusion is also consistent with our decision in *Mason*. Although we acknowledge that *Mason* addressed both the right to silence and the right to counsel and that the test applied to a subsequent waiver of the right to counsel is different from the test applied here, we still find this case helpful insofar as it examines whether a waiver of *Miranda* rights can be knowing and voluntary without the defendant having been expressly advised of his rights again following and assertion of those rights.

In *Mason*, officers advised the defendant of his *Miranda* rights on January 8, 1980, and the defendant then gave a statement. *Mason*, 31 Wn. App. at 42-43. Officers arrested the defendant on February 4, and they advised him of his *Miranda* rights again. *Mason*, 31 Wn. App. at 43. Officers then transported the defendant to the juvenile detention center and booked him. *Mason*, 31 Wn. App. at 43. After booking, the defendant requested to talk to a detective and asked the detective some procedural questions. *Mason*, 31 Wn. App. at 43. The detective then asked the defendant if he wanted to make a statement; the defendant declined and said he wanted to see an attorney. *Mason*, 31 Wn. App. at 43. Fifteen to twenty minutes later, the defendant asked to speak to the detective again, and he told the detective he was scared. *Mason*, 31 Wn. App. at 43. The detective told the defendant that he did not blame the defendant for being scared because the charges were serious, and the defendant made an incriminating statement. *Mason*, 31 Wn.2d at 43. The defendant later gave a written statement. *Mason*, 31 Wn. App. at 44. The trial court admitted the defendant's oral statements. *Mason*, 31 Wn. App. at 44.

On appeal, we discussed the voluntariness of the defendant's waiver, noting that a voluntary waiver could be inferred from the defendant's understanding of his rights and the

---

the fact the later questioning was about the same crime was not a determinative factual distinction), *review denied*, 87 Wn.2d 1012 (1976); *see also Boggs*, 16 Wn. App. at 687.

voluntary nature of his conversation with the officer. *Mason*, Wn. App. at 45-46. In reaching this conclusion, we considered the fact the defendant had been advised of his *Miranda* rights 30 minutes before making his incriminating statement, the fact the defendant had a substantial criminal history, and fact the defendant had been advised of his *Miranda* rights 12 times in five years. *Mason*, 31 Wn. App. at 46. We look to similar factors here and come to the same conclusion in regard to the June 6 interview in Yakima.

## C. Statements During Transport

Elkins next argues that the trial court should have suppressed the statements he made to Kolilis while Kolilis was transporting him to Grays Harbor County. Elkins contends that because his statements were in response to statements Kolilis made that were reasonably likely to elicit an incriminating response and because these statements were part of a continuing violation of his constitutional rights, the statements should have been suppressed. Elkins concedes, however, that these statements were never presented to the jury, so any error in admitting these statements was harmless error. But he argues that we should still "analyze the statements because of their impact on the third set of statements." Br. of Appellant at 14.

Even assuming, but not deciding, that this issue was preserved below,[14] any potential error in failing to suppress these statements was clearly harmless because these statements were never presented to the jury. Accordingly, we decline to address this issue further. However, we discuss below the extent to which these statements relate to Elkins' June 7 statement.

---

[14] RAP 2.5(a).

## D. June 7 Statements

Elkins next argues that the trial court should have suppressed the statements he made after his arrival in Grays Harbor County on June 7 because these statements were made as part of an ongoing violation of his right to silence and his right to counsel[15] and because Kolilis was responsible for initiating the further interrogation. We disagree.

Once a defendant has asserted his right to counsel, a waiver of the right to counsel is valid only if the police scrupulously honored that request, the defendant initiated further relevant conversation, and the defendant's waiver was knowing and voluntary. *State v. Earls*, 116 Wn.2d 364, 382-383, 805 P.2d 211 (1991). "Courts indulge every reasonable presumption against waiver of constitutional rights." *Earls*, 116 Wn.2d at 383 (citations omitted).

Elkins first contends that his June 7 statements should be suppressed as "'fruit of the poisonous tree'" because they were the result of "the earlier constitutional violations." Br. of Appellant at 17 (quoting *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). But, as discussed above, the deputies did not violate Elkins' right to silence when they interrogated him on June 6, and Elkins did not request counsel until the end of the June 6 interrogation, at which point the deputies ended the interview. Thus, this argument fails.

Elkins next contends that Kolilis improperly initiated the further interrogation on June 7 by engaging in conversation with him during the drive from Yakima County to Grays Harbor

---

[15] Elkins did not argue at the suppression hearing that these statements should have been suppressed because the law enforcement officers failed to make all reasonable efforts to put him in contact with an attorney after he invoked his right to counsel on June 6 as required by CrR 3.1(c)(2). *See State v. Pierce*, 169 Wn. App. 533, 543-44, 280 P.3d 1158, *review denied*, 175 Wn.2d 1025 (2012). Because Elkins did not raise this issue in the trial court, we do not address any issues related to any potential delay in obtaining counsel and limit this discussion to whether his *Miranda* rights were respected.

County. Elkins asserts that he did not voluntarily initiate further conversation related to the case because (1) the conversation in the car was lengthy, over four hours, (2) Kolilis initiated the conversation, and (3) Kolilis admitted that he had hoped to encourage Elkins to talk about the case by initiating small talk. Br. of Appellant at 15-16. Again, we disagree.

Kolilis's uncontradicted testimony established that Elkins was the one who changed the direction of the conversation from a casual conversation to one focused on the crime, and Kolilis merely told Elkins to wait until they arrived in Grays Harbor County and they could properly advise him of his rights. And the law prohibits improper interrogation, not casual conversation. *State v. Cunningham*, 116 Wn. App. 219, 228, 65 P.3d 325 (2003) (*Miranda* applies to custodial interrogations by state agent; "[a]n interrogation occurs when the investigating officer should have known his or her questioning would provoke an incriminating response.").

Furthermore, although Elkins argues that under *State v. Ladson*, 138 Wn.2d 434, 979 P.2d 833 (1999), we can consider the law enforcement officer's subjective intent as a factor when determining who reinitiated the interrogation, Kolilis testified that it was *not* his intent to persuade Elkins to say anything incriminating or to encourage him to give a statement by engaging in small talk. Although Kolilis also admitted that he "always *hope*[*d*] that people come forward and be truthful," he never said that was why he engaged in conversation with Elkins during the drive. 1 VRP at 51 (emphasis added). Thus, even assuming, but not deciding, that we can consider Kolilis's intentions, Elkins does not show that Kolilis's subjective intent was a factor here. Accordingly, Elkins fails to show that the trial court erred in admitting his June 7 statements.

## II. DENIAL OF MOTION FOR MISTRIAL

Elkins next argues that the trial court erred when it denied his motion for a mistrial after Kolilis commented on Elkins' exercise of his right to silence and right to counsel. We disagree.

18

We review for abuse of discretion a trial court's denial of a motion for mistrial. *State v. Rodriguez*, 146 Wn.2d 260, 269, 45 P.3d 541 (2002). The trial court abuses its discretion only when "'no reasonable judge would have reached the same conclusion.'" *Rodriguez*, 146 Wn.2d at 269 (quoting *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)). We will overturn the trial court's decision to deny a motion for mistrial only "when there is a 'substantial likelihood' that the error prompting the mistrial affected the jury's verdict." *Rodriguez*, 146 Wn.2d at 269-70 (quoting *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994) (internal quotations omitted), *cert. denied*, 514 U.S. 1129 (1995)).

Elkins has not established a substantial likelihood that Kolilis's testimony affected the jury's verdict. Although it was arguably improper for Kolilis to mention Elkins' exercise of his right to silence and request for counsel, the jury also heard that Elkins later willingly spoke to law enforcement and gave a statement. Thus, any negative implication from Elkins' refusal to talk to law enforcement and his request for counsel was significantly eroded by his later willingness to forgo counsel and give a statement. Furthermore, the trial court directed the jury to disregard Kolilis's statement, and we presume that the jury follows the trial court's instructions. *State v. Johnson*, 124 Wn.2d 57, 77, 873 P.2d 514 (1994). Accordingly, this argument fails.

### III. RCW 9A.32.050(1)(B) NOT VAGUE

Finally, Elkins argues that second degree felony murder based on the predicate offense of the assault statute is unconstitutionally vague as applied. We disagree.

#### A. Standard of Review

The constitutionality of a statute is a question of law that we review de novo. *State v. Watson*, 160 Wn.2d 1, 5-6, 154 P.3d 909 (2007). Where, as here, the challenged statute "does not involve First Amendment rights, we evaluate the vagueness challenge by examining the statute as

19

applied under the particular facts of the case." *State v. Jenkins*, 100 Wn. App. 85, 89, 995 P.2d 1268 (citing *State v. Coria*, 120 Wn.2d 156, 163, 839 P.2d 890 (1992)), *review denied*, 141 Wn.2d 1011 (2000). We presume statutes to be constitutional, and the challenger bears the burden of proving vagueness beyond a reasonable doubt. *Coria*, 120 Wn.2d at 163. To meet this burden, Elkins "must show, beyond a reasonable doubt, that either (1) the statute does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed, or (2) the statute does not provide ascertainable standards of guilt to protect against arbitrary enforcement." *Coria*, 120 Wn.2d at 163.

## B. Definiteness

RCW 9A.32.050 provides in part:

(1) A person is guilty of murder in the second degree when:
. . .
(b) He or she commits or attempts to commit any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c),[16] and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

Elkins argues that, as the *Andress*[17] court discussed, the "in furtherance of language" in the second degree felony murder statute makes no sense when the predicate felony is assault and this results in an unduly harsh result, particularly because manslaughter is not a lesser included offense of felony murder. Br. of Appellant at 25 (citing *Andress*, 147 Wn.2d at 615-16). But the language in *Andress* was part of our Supreme Court's legislative intent analysis in *Andress* and does not establish that the statute is vague. *Andress*, 147 Wn.2d at 615-16; *see also State v. McDaniel*, 185

---

[16] RCW 9A.32.030(1)(c) enumerates the predicate offenses for first degree felony murder.

[17] *In re Pers. Restraint of Andress*, 147 Wn.2d 602, 56 P.3d 981 (2002).

Wn. App. 932, 344 P.3d 1241, 1243-44 (2015)[18] (holding that the statute establishing the offense of felony murder based on the predicate offense of the assault of the victim is not ambiguous); *State v. Gordon*, 153 Wn. App. 516, 528-29, 223 P.3d 519 (2009) (addressing the rule of lenity and rejecting the appellant's argument that the second degree felony murder statute was ambiguous when based on the predicate felony of assault), *reversed in part on other grounds*, 172 Wn.2d 671, 260 P.3d 8874 (2011). That a criminal statute's legislative intent may be difficult to determine or application of the statute produces a harsh result does not establish that the statute fails to define the offense sufficiently to allow an ordinary person to understand what conduct is prescribed or that the statute does not provide ascertainable standards of guilt to protect against arbitrary enforcement.

RCW 9A.32.050(1)(b) clearly and unequivocally states that an assault that results in the death of the assault victim is second degree felony murder; this is sufficient to allow an ordinary person to understand what conduct is prescribed.

### C. Ascertainable Standards

Elkins' argument could also be construed as claiming that the second degree felony murder based on the predicate felony of assault statute fails to provide ascertainable standards of guilt because it allows the State to charge and convict a defendant of second degree murder without establishing that the defendant intended to kill the victim. This argument also fails.

The requirement that a statute provide ascertainable standards of guilt protects against arbitrary, erratic, and discriminatory enforcement. *City of Spokane v. Douglass*, 115 Wn.2d 717, 180, 795 P.2d 693 (1990). "In this respect, the due process clause forbids criminal statutes that contain no standards and allow police officers, judge, and the jury to subjectively decide what

---

[18] Petition for review pending.

conduct the statute proscribes or what conduct will comply with a statute in any given case." *Douglass*, 115 Wn.2d at 181 (citing *State v. Maciolek*, 101 Wn.2d 259, 267, 676 P.2d 996 (1984)).

Elkins' argument focuses on the fact the statute allows the State to convict a person of second degree murder without requiring the State to prove that the defendant intended to kill the victim. But the legislature has the authority to define the elements of a crime, including the required mens rea required to prove the crime. *State v. Evans*, 154 Wn.2d 438, 447 n.2, 114 P.3d 627, *cert. denied*, 546 U.S. 983 (2005); *State v. Bash*, 130 Wn.2d 594, 604, 925 P.2d 978 (1996). And Elkins does not explain how defining second degree murder based on the predicate offense of assault to require only the mens rea for the assault rather than intent to murder fails to provide ascertainable standards of guilt. Accordingly, this argument fails.

## IV. CONCLUSION

We hold that there is no bright-line rule that law enforcement officers must always fully readvise a defendant of his or her right to silence or right to counsel, and whether a defendant's rights have been scrupulously honored must be determined on a case-by-case basis. When, as was the case here, the other three factors enumerated in *Mason* are met, the interrogation following the defendant's assertion of his or her rights is proper if the State has shown that the defendant knowingly and voluntarily waived those rights given the totality of the circumstances, not whether the subsequent contact was preceded by law enforcement fully readvising the defendant of his or her *Miranda* rights.

Elkins' statements in Yakima were admissible because the law enforcement officers scrupulously honored Elkins' assertion of his right to silence by ensuring that he understood his rights and knew these rights applied to any subsequent interrogation. Elkins' statements in Grays Harbor were admissible because he initiated the relevant conversation following his assertion of

22

his right to counsel and then knowingly and voluntarily waived his *Miranda* rights. Additionally, because the deputy's comment on Elkins' right to silence and right to counsel during trial was harmless, his challenge to the trial court's denial of his motion for mistrial also fails. And, finally, because Elkins fails to show that the felony murder statute does not define the offense sufficiently to allow an ordinary person to understand what conduct is prescribed or that the statute does not provide ascertainable standards of guilt to protect against arbitrary enforcement, his vagueness challenge fails. Accordingly, we affirm.

_____
SUTTON, J.

We concur:

_____
WORSWICK, J.

_____
BJORGEN, A.C.J.