# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>AARON MAURICE MYLAN,<br><br>Appellant. | No. 57107-2-II<br><br>UNPUBLISHED OPINION |

MAXA, P.J. – Aaron Mylan appeals his conviction of felony harassment arising out of an incident at a gas station in which he threatened multiple times to kill a store clerk. Mylan told the clerk that he had been to jail and was not afraid to go back. Another store clerk and a woman in the restroom called 911 to report that the incident was occurring. Mylan repeated similar comments to investigating law enforcement officers.

We hold that (1) there was sufficient evidence to support Mylan's felony harassment conviction, (2) the trial court did not err in denying a motion to suppress Mylan's statements to law enforcement officers that he had been in prison, (3) the admission of the 911 calls did not violate the confrontation clause because they were not testimonial, (4) we decline to consider Mylan's argument that his statements on body camera footage about being in prison were inadmissible under ER 404(b) because he did not preserve the issue at trial, (5) Mylan did not receive ineffective assistance of counsel when defense counsel failed to request a limiting

instruction regarding the evidence about being in jail, and (6) there was no cumulative error warranting reversal.

Accordingly, we affirm Mylan's conviction, but we remand for the trial court to correct a scrivener's error in the judgment and sentence regarding Mylan's offender score.

FACTS

*Background*

On April 24, 2022, Mylan entered a gas station shirtless and carrying a backpack. Mylan wanted to use the restroom, but store clerk David Hamilton-Ross told him that it currently was in use. Mylan attempted to enter the restroom anyway. The two began yelling at each other and Mylan berated Hamilton-Ross with expletives and racial slurs. Mylan then told Hamilton-Ross, "I'll kill you. I just got out of jail. I'm not scared to go back. I'll kill you right now." 2 Report of Proceedings (RP) at 306.

Hamilton-Ross pushed the panic button and one of the other store clerks called 911. A woman in the restroom also called 911. Mylan continued to threaten to kill Hamilton-Ross and said, "Just wait. I'm not scared to go back to jail." 2 RP at 307.

Mylan briefly left the gas station and when he returned he began destroying property and threating the store clerks and customers. Hamilton-Ross left the gas station because he did not feel safe, and Mylan chased him out into the parking lot, threatening to beat him up and kill him. Mylan then left the area.

Officer John Chesney arrived at the gas station and interviewed Hamilton-Ross about the incident. Around the same time, Corporal Jordan Ejde was on patrol when he saw Mylan, who fit the description of the person involved in the gas station incident, on a sidewalk. Mylan waved

2

at Ejde like he wanted to talk with him. Ejde pulled over to report to Chesney that he found someone matching the description, and then he contacted Mylan and asked what had happened at the gas station. Mylan explained what had happened. Eventually, Chesney and other officers arrived on scene. The other officers were approximately eight to 10 feet away while Chesney spoke to Mylan.

Chesney asked Mylan what had occurred at the gas station. Mylan was cooperative and willingly spoke with Chesney. Chesney then read Mylan his *Miranda*[1] rights and arrested him.

The State charged Mylan with a hate crime and then later added the charge of felony harassment (threat to kill).

*CrR 3.5 Hearing*

The trial court held a CrR 3.5 hearing to determine whether the State could use Mylan's statements to law enforcement officers at trial. Ejde testified to the facts stated above. He also stated that when he contacted Mylan, Mylan was free to go at any point. Ejde did not read Mylan the *Miranda* warnings. Ejde's interaction with Mylan only lasted a few minutes before Chesney arrived.

Chesney testified that when he heard that Ejde had contacted a possible suspect, Chesney took Hamilton-Ross to Ejde's location to identify him. Chesney then contacted Mylan and introduced himself. Mylan was not in handcuffs or restrained during the interaction, nor did the officers control his movements or detain him.

Mylan told Chesney that he thought the store clerk was being aggressive with him when he told him to wait for the restroom and that made him upset. Mylan admitted that he told the

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

store clerk that he would beat him up. Mylan also told Chesney that he had been to prison. After

talking with Mylan for around seven minutes, Chesney read Mylan his *Miranda* rights and

placed him under arrest.

The trial court ruled that Mylan's statements were admissible, and made extensive oral

findings of fact. These oral finding included the following:

> Corporal Ejde had contact with the defendant who met generally the description of a suspect in a potential investigation including that it was a white male who was balding, muscular build, with white sweats.
> He saw the defendant on the roadside. The defendant, apparently, when he saw Corporal Ejde, hailed him or waved him over. So Corporal Ejde went over to him and parked, got out of his car, and began to have the conversation with the defendant.
> . . . .
> There were no lights or sirens, no indication of a firearm being unholstered. There was no handcuffs. There was distance between the officer and the defendant during that period of time, including between eight and ten feet away.
> There was no directions to stay put or not leave. If he had attempted to walk off, Corporal Ejde probably would have let him walk away.
> . . . .
> When Officer Chesney had contact with the defendant, he had some information from the clerks of the gas station that he believed established probable cause to arrest for malicious harassment, I believe is what he described. At that time he also had the positive identification that Mr. Mylan was the person of interest in that investigation.
> During the conversation he had with Mr. Mylan, there were no handcuffs, the police cars were not activating their – had not been activating their overheads, the police officers that were on scene gave some distance to the defendant up to eight to ten feet. There were four police officers total which are not insignificant, but none of them were in such a way to – they were all eight to ten feet away.
> There is some questioning of the defendant without the advice of *Miranda*, but at that time Mr. Mylan was not under arrest in a way that would require – he was not – he was free to go, at least at that point. He was not under arrest that would require *Miranda* warnings to be given.
> He gave a recitation of his viewpoint of what happened at the gas station. The conversation at that point took about another seven to eight minutes, according to the officer.
> . . . .
> So what I find is that at this point the *Miranda* was not required during the contact with Corporal Ejde nor during the contact until arrest by Officer Chesney.

4

> The comments that were made were made freely and voluntarily, and any statement that was made potentially could be used in this trial, pending other evidentiary resources. That's the ruling of the Court on that.

1 RP at 37-41. The trial court did not enter written findings of fact or conclusions of law.

*Pretrial Motions*

Before trial started, the State raised the issue of the admissibility of the 911 calls recorded during the event because the two callers would not be present to testify.

The first call was from Brett Berkompas, the other store clerk working with Hamilton-Ross. Berkompas described to the 911 operator that there was a man inside their store antagonizing him and his coworker. Mylan's yelling could be heard in the background. Berkompas told the operator that they already asked Mylan many times to leave and that Mylan was "being extremely aggressive with his words. I'm sure you can hear." CP at 24. Berkompas was describing Mylan's appearance to the operator as Mylan and Hamilton-Ross were yelling at each other in the background. The operator asked if that was Mylan banging on things to which Berkompas affirmatively replied. Berkompas described the whole incident until Mylan left the store.

The second call was from Ashley Siva, who was in the restroom with her son during the altercation. Siva called 911 and told the operator that "there is a huge argument going on and I'm hearing people threatening to kill . . . somebody." CP at 38. She could not see anything so she relayed everything she was hearing to the operator. She described the slamming noises she was hearing and said that there was a lot of yelling.

The trial court noted that the statements were hearsay but ruled that they fit within the present sense impression exception to the hearsay rule. And the court ruled that because the

5

statements were describing events as they were occurring and were made for the purpose of requesting emergency help, they were nontestimonial. Therefore, the court ruled that the confrontation clause was not implicated by the 911 calls.

The trial court also addressed the issue of Chesney's body camera footage during his interaction with Mylan. As Mylan was describing what had happened, he made statements such as "I'm institutionalized" and "I've been incarcerated half my life." 1 RP at 67. Defense counsel recognized that the footage was admissible evidence, but asked that the statements about being in prison be edited out. The prosecutor commented that the relevance of Mylan's statement that he had been to prison went to Hamilton-Ross's reasonable fear. The court ruled that the body camera footage was admissible, stating that the probative value outweighed the prejudicial effect. Defense counsel did not object or reference ER 404(b).

*Trial and Sentencing*

At trial, Hamilton-Ross, Chesney, and Ejde testified to the facts above. Hamilton-Ross testified that he was really scared of Mylan's threats to kill him because Mylan was reaching inside his backpack and he did not know what Mylan had in there. Hamilton-Ross testified that Mylan threatened to kill him dozens of times. And when Mylan reentered the store and started banging on freezers, he continued to threaten Hamilton-Ross and his coworker. Hamilton-Ross went outside because he did not feel safe anymore, and Mylan chased him around outside while threatening to beat him up and kill him. Hamilton-Ross testified that he took the threats made against him seriously.

Chesney's body camera footage was admitted into evidence without objection, and defense counsel did not propose a limiting instruction. Mylan chose not to testify.

6

The jury found Mylan not guilty of a hate crime but guilty of harassment with a threat to kill.

At sentencing, the State calculated Mylan's offender score as 10 after not counting one of Mylan's 2017 convictions that was overturned on appeal. The trial court agreed with the State that Mylan's offender score was 10. But the court's judgment and sentence stated that his offender score was 11 instead of 10.

Mylan appeals his conviction.

## ANALYSIS

A.    SUFFICIENCY OF EVIDENCE – FELONY HARASSMENT

Mylan argues that the State failed to provide sufficient evidence needed to prove Mylan's conviction of harassment with a threat to kill. We disagree.

1.    Legal Principles – Harassment

Under RCW 9A.46.020(1), a person is guilty of harassment if:

(a) Without lawful authority, the person knowingly threatens:
(i) To cause bodily injury immediately or in the future to the person threatened or to any other person; [and]
. . . .
(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out.

Harassment is a gross misdemeanor unless the harassment involves "threatening to kill the person threatened or any other person." RCW 9A.46.020(2)(b)(ii). Harassment involving a death threat is a class C felony. RCW 9A.46.020(2)(b).

RCW 9A.46.020 criminalizes pure speech. *State v. Kilburn*, 151 Wn.2d 36, 41, 84 P.3d 1215 (2004). Because the First Amendment to the United States Constitution prohibits laws that abridge the freedom of speech, the harassment statute must be applied in conformance with the

First Amendment. *Id.* But the First Amendment protection does not extend to certain unprotected speech, including "true threats." *State v. Allen*, 176 Wn.2d 611, 626, 294 P.3d 679 (2013). As a result, we interpret RCW 9A.46.020(1)(a) as prohibiting only unprotected true threats. *Id.*

We employ a reasonable person standard for what constitutes a "true threat" under the First Amendment. *State v. Trey M.*, 186 Wn.2d 884, 894, 383 P.3d 474 (2016). A "true threat" is a statement made in a context or under circumstances where a reasonable person would foresee that the statement would be interpreted as a serious expression of intent to inflict bodily harm upon or take the life of another person. *Id.* However, a communication using the wording of a threat but which in fact is merely a joke, idle talk, or hyperbole is not a true threat. *State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010).

A statement can constitute a true threat even if the speaker has no actual intent to carry out the threat. *Kilburn*, 151 Wn.2d at 46. This is because a true threat arouses fear in the person threatened, and that fear does not depend upon the speaker's intent. *Id.* The only question is whether a reasonable speaker would foresee that the threat would be considered serious. *Trey M.*, 186 Wn.2d at 894.

Under RCW 9A.46.020(1)(b), the defendant's words or conduct also must place the person threatened in reasonable fear that the threat will be carried out. This provision requires both that the person threatened must subjectively fear that the threat will be carried out and that the victim's fear must be reasonable based on an objective standard, considering all the facts and circumstances of the case. *See State v. Cross*, 156 Wn. App. 568, 582, 234 P.3d 288 (2010),

*cause remanded on other grounds*, 172 Wn.2d 1009, 260 P.3d 208 (2011); *State v. E.J.Y.*, 113 Wn. App. 940, 953, 55 P.3d 673 (2002).

    2.    Standard of Review

Ordinarily, the test for determining sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). When contesting the sufficiency of the evidence, the defendant admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. *Trey M*., 186 Wn.2d at 905. Credibility determinations are made by the trier of fact and are not subject to review. *Id.* Circumstantial and direct evidence are equally reliable. *Id.* We apply this standard to the reasonable fear requirement.

However, because the true threat requirement implicates the First Amendment, we apply a heightened review for that requirement. *Kilburn*, 151 Wn.2d at 49. When assessing whether a statement is a true threat, we must engage in an independent review of the crucial facts that involve the legal determination of whether the speech is unprotected. *Id.* at 52. This review also may require us to look to the factual context in which the statement was made. *Id.* But we still defer to the fact finder on issues of credibility. *Id.* at 50.

    3.    True Threat Analysis

The question here is whether the State presented sufficient evidence that Mylan's threats to kill Hamilton-Ross were made in a context or under such circumstances that a reasonable person would foresee that it would be interpreted as a serious expression of an intention to kill

him. *See Trey M.*, 186 Wn.2d at 894. The defendant's demeanor is a key factor in making this determination. *Id.* at 906-07.

Here, Mylan's demeanor and actions provide a sufficient basis for concluding that Mylan's statements constituted a true threat. Mylan was angry and agitated, repeatedly threatened to kill Hamilton-Ross, and accompanied those threats with racial slurs. Mylan then chased Hamilton-Ross around the parking lot, again threatening to kill him. Mylan told Hamilton-Ross that he had been to jail and was not afraid of going back.

Based on an independent review of the crucial facts, we hold that there was sufficient evidence to establish that Mylan's threat to kill Hamilton-Ross was a true threat.

4.    Reasonable Fear Analysis

We next consider whether the State presented sufficient evidence that Mylan's threat to kill Hamilton-Ross placed him in reasonable fear that he would carry out his threat to kill him. RCW 9A.46.020(1)(b). The question here is whether there was evidence that Hamilton-Ross subjectively feared that Mylan's threats would be carried out and whether that fear was objectively reasonable. *See Cross*, 156 Wn. App. at 582.

Here, Hamilton-Ross testified that he did not feel safe around Mylan and that he took his threats very seriously. Hamilton-Ross also was afraid that Mylan had something in his backpack that would assist in carrying out the threat. He testified that he thought Mylan was angry enough to hurt and kill him. Hamilton-Ross's testimony supports the inference that he subjectively feared that Mylan would carry out the threat to kill him.

Viewing the evidence in the light most favorable to the State, Hamilton-Ross's fear was objectionably reasonable. Mylan was angry and agitated, he incessantly threated to kill

10

Hamilton-Ross, he reached into his backpack where he might have had a weapon, and he chased Hamilton-Ross outside of the gas station. Mylan was banging on and destroying equipment and told Hamilton-Ross that he had been to jail and was not afraid of going back.

Mylan argues that Hamilton-Ross's fear was not objectively reasonable because Hamilton-Ross testified that he served in the Marine Corps and he stood up for himself by yelling back at Mylan. But these actions are not inconsistent with reasonable fear.

The evidence supports the inference that Hamilton-Ross's fear that Mylan would carry out the threats to kill him was objectively reasonable.

5. Summary

Drawing all inferences in the State's favor, a rational trier of fact could have concluded that Mylan's threats to kill Hamilton-Ross were true threats and that those threats placed Hamilton-Ross in reasonable fear that the threats would be carried out. Accordingly, we hold that the State presented sufficient evidence to support Mylan's conviction of harassment with a threat to kill.

B. ADMISSIBILITY OF PREARREST STATEMENTS

Mylan argues that the trial court erred in failing to suppress the statements he made to law enforcement officers before he received the *Miranda* warnings. We disagree.

1. Failure to Enter Written Findings

Initially, Mylan and the State agree that the trial court failed to enter findings of fact and conclusions of law after the CrR 3.5 hearing. Mylan argues that we should remand for entry of findings, but the State argues that even without the written findings, the trial court's oral findings are sufficient to enable review. We agree with the State.

The purpose of a CrR 3.5 hearing is to prevent "the admission involuntary, incriminating statements." *State v. Williams*, 137 Wn.2d 746, 751, 975 P.2d 963 (1999). Under CrR 3.5, the trial court must conduct an admissibility hearing before admitting a defendant's statement into evidence. CrR 3.5(c) requires the trial court to enter written findings of fact and conclusions of law after a CrR 3.5 hearing. Failure to enter written findings and conclusions after a CrR 3.5 hearing is error. *State v. Elkins*, 188 Wn. App. 386, 396, 353 P.3d 648 (2015). However, the failure to enter written findings and conclusions following a CrR 3.5 hearing is harmless error if the oral findings are sufficient to enable appellate review. *Id.*

Here, the trial court in its oral ruling specifically stated what facts it was finding and relying on in order to reach its decision. The court found that (1) Mylan initiated police contact by waving down Ejde; (2) he openly spoke to Ejde and was free to leave during that interaction; (3) at no time did any of the police cars have their lights or sirens on; (4) although Chesney asked him some questions, Mylan was not under arrest in any way that would require *Miranda* warnings; and (5) Mylan made his comments to the officers freely and voluntarily.

We hold that these findings and the trial courts conclusion that the statements were admissible are sufficient for appellate review.

2. Custodial Interrogation

Mylan argues that he was subjected to custodial interrogation before he was given his *Miranda* warnings. We disagree.

a. Legal Principles

The Fifth Amendment to the United States Constitution states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the

12

Washington Constitution states "[n]o person shall be compelled in any criminal case to give evidence against himself." "Both provisions guarantee a defendant the right to be free from self-incrimination, including the right to silence." *State v. Pinson*, 183 Wn. App. 411, 417, 333 P.3d 528 (2014).

*Miranda* warnings are required when a person in custody is subjected to custodial interrogation. *State v. Mayer*, 184 Wn.2d 548, 556, 362 P.3d 745 (2015). A person is in custody when their freedom of action has been reduced in such a way as to resemble a formal arrest. *State v. Escalante*, 195 Wn.2d 526, 533, 461 P.3d 1183 (2020). The relevant inquiry for determining whether a person is in custody is "an objective one that asks how a reasonable person in the suspect's position would have understood the circumstances." *Id.*

> To determine whether a reasonable person in the suspect's position would feel restrained to the degree associated with formal arrest, a court examines the totality of the circumstances. Relevant circumstances may include the nature of the surroundings, the extent of police control over the surroundings, the degree of physical restraint placed on the suspect, and the duration and character of the questioning.

*Id.* at 533-34.

We review challenged findings of fact entered after a CrR 3.5 hearing for substantial evidence and review de novo whether the trial court's conclusions of law are supported by its findings of fact. *State v. Rosas-Miranda*, 176 Wn. App. 773, 779, 309 P.3d 728 (2013).

  b.   Analysis

Here, Ejde did not detain Mylan. Instead, Mylan waved down Ejde and wanted to talk with him. Ejde did not activate his lights. Ejde was by himself when he contacted Mylan, and stood eight to ten feet away. Ejde did not tell Mylan at any point that he was not free to leave,

and that if he tried to walk away, Ejde probably would have let him. The trial court's findings support the conclusion that Ejde's conversation with Mylan was not custodial.

When Chesney arrived, he did not activate his lights and did not place Mylan in handcuffs. Other officers were present, but they stood eight to 10 feet away. Chesney engaged in a conversion with Mylan, but there was no indication that Mylan was not free to go. The trial court's findings support the conclusion that Chesney's conversation with Mylan was not custodial.

We hold that the trial court did not err in finding that Mylan's statements to Chesney did not result from a custodial interrogation and were admissible.

C.      ADMISSION OF 911 CALLS

Mylan argues that the trial court's admission of the 911 calls violated the confrontation clause. We disagree.

1.      Legal Principles

The confrontation clause of the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution provide that accused persons have the right to confront witnesses against them. The confrontation clause precludes the admission of "testimonial" out-of-court statements if the declarant is unavailable and the defendant had no prior opportunity to cross-examine the declarant. *State v. Burke*, 196 Wn.2d 712, 725, 478 P.3d 1096, *cert. denied*, 142 S. Ct. 182 (2021). We review confrontation clause challenges de novo. *Id.*

We use the primary purpose test to determine whether out-of-court statements are testimonial. *Id.* at 726. "Statements are testimonial when they are made to establish past facts in

14

order to investigate or prosecute a crime." *Id.* However, statements made for another primary purpose are nontestimonial. *Id.* at 727. When the primary purpose of a statement is to "respond to an ongoing emergency, for example, 'it's purpose is not to create a record for trial and thus is not within the scope of the Clause.' " *Id.* at 726 (quoting *Michigan v. Bryant*, 562 U.S. 344, 370, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011)). The Supreme Court in *Burke* stated,

> Statements made to assist police in addressing an ongoing emergency is a well-established nontestimonial purpose. For example, frantic statements to a 911 emergency operator describing the identity of an assailant in a domestic disturbance *in progress* were nontestimonial because the declarant was seeking help in the face of immediate danger.

196 Wn.2d at 727. In addition, statements made to persons other than law enforcement officers are less likely to be deemed testimonial. *Id.* at 728.

In determining whether a statement is testimonial, "we must objectively evaluate the statements and actions of both the declarant and the individual who hears the statements in light of the circumstances in which their conversation occurred." *Id.* at 726.

2. Analysis

Objectively viewing the statements made to the 911 operator by Berkompas and Siva in the light of the circumstances, we hold that their statements were nontestimonial. The primary purpose of each of their statements was to assist in an ongoing emergency.

Berkompas's statements to the 911 operator described the incident as it was happening. He gave operators a description of Mylan as he was in the gas station yelling at Hamilton-Ross and banging on equipment. Mylan could be heard in the background of the call. In addition, this statement was made to a 911 operator, not to the police.

Similarly, Siva's statements to the 911 operator described the ongoing altercation occurring outside of the restroom. She reported that she could hear men yelling at each other and one of them was threatening the other. Siva could not give a description of what Mylan looked like because she was locked in the restroom with her young son, but she was describing what she could hear through the door. She even described to the operator when things got quiet again because she thought Mylan had left the gas station.

Because the 911 calls described an ongoing emergency, we hold that they were nontestimonial and the trial court's admission of the statements did not violate the confrontation clause.

D.      ADMISSION OF BODY CAMERA FOOTAGE

Mylan argues that the trial court erred in admitting Chesney's body camera footage, which included Mylan's statements about being in prison. We decline to address this issue.

Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, this evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

A failure to object that evidence is inadmissible under ER 404(b) waives any claimed error on appeal. *State v. Powell*, 166 Wn.2d 73, 82, 206 P.3d 321 (2009). "We adopt a strict approach because trial counsel's failure to object to the error robs the court of the opportunity to correct the error and avoid a retrial." *Id.*

16

Here, Mylan did not object to the admission of the body camera footage and did not reference ER 404(b) in the trial court. Accordingly, we decline to consider Mylan's ER 404(b) argument because he did not preserve the issue at trial.

E.      INEFFECTIVE ASSISTANCE OF COUNSEL

Mylan argues that he was denied effective assistance because his defense counsel failed to request a limiting instruction for the admission of the body camera footage. We disagree.

1.    Legal Principles

Ineffective assistance of counsel claims arise from the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021). To prevail on an ineffective assistance claim, the defendant must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced the defendant. *Id.* at 247-48. Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Id.* Prejudice exists if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have differed. *Id*. at 248.

We apply a strong presumption that defense counsel's performance was reasonable. *Id*. at 247. Defense counsel's conduct is not deficient if it was based on legitimate trial strategy or tactics. *Id*. at 248. To rebut the strong presumption that counsel's performance was effective, the defendant bears the burden of establishing the absence of any legitimate strategic or tactical reason explaining defense counsel's conduct. *Id.*

17

### 2. Analysis

Here, Mylan would have been entitled to an ER 404(b) limiting instruction if defense counsel had requested one. If evidence of a defendant's prior bad acts is admissible for a proper purpose, the defendant is entitled to an appropriate limiting instruction. *State v. Gresham*, 173 Wn.2d 405, 423, 269 P.3d 207 (2012). But Mylan did not request a limiting instruction on the ER 404(b) evidence. And the trial court has no duty to give an ER 404(b) limiting instruction sua sponte. *State v. Russell*, 171 Wn.2d 118, 123-24, 249 P.3d 604 (2011) (citing ER 105).

We generally presume that defense counsel's choice not to request a limiting instruction was a tactical decision to avoid drawing further attention to the evidence, and therefore we place the burden on the defendant to rebut this presumption. *State v. Yarbrough*, 151 Wn. App. 66, 90-91, 210 P.3d 1029 (2009). Here, Mylan does not meet his burden of establishing the absence of any legitimate strategic or tactical reason explaining his defense counsel's conduct. Mylan's statement did not reveal the nature of his previous offenses, and defense counsel may have decided to forgo a limiting instruction to avoid reemphasizing the fact that Mylan previously was in prison.

Because defense counsel's failure to request a limiting instruction may have been a legitimate trial tactic, Mylan does not show that his trial counsel's performance fell below an objective standard of reasonableness. Accordingly, Mylan's ineffective assistance claim fails.

### F. CUMULATIVE ERROR

Mylan argues that cumulative errors throughout the trial prevented him from having a fair trial. We disagree.

Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). The cumulative error doctrine may warrant reversal, even if each error standing alone would otherwise be considered harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). This doctrine does not apply when "the errors are few and have little or no effect on the outcome of the trial." *Id.*

Here, Mylan has not demonstrated that any error denied him a fair trial. Therefore, we hold that the cumulative error doctrine is inapplicable.

G.      SCRIVENER'S ERROR

Mylan argues, and the State concedes, that his judgment and sentence contains a scrivener's error regarding his offender score and that this court should remand to correct it. We accept the State's concession.

At sentencing, the trial court agreed with the State that Mylan's offender score was 10. However, the judgment and sentence showed that Mylan's offender score as 11. We remand to the trial court to amend the judgment and sentence to correct this error.


CONCLUSION

We affirm Mylan's conviction, but we remand for the trial court to correct the scrivener's error in the judgment and sentence regarding Mylan's offender score.

19

No. 57107-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

VELJACIC, J.

PRICE, J.