IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81045-6-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DONALD WILLIAM BANGO, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Donald W. Bango seeks reversal of his convictions for second degree murder, criminal impersonation, and tampering with a witness. He argues that a juror was excluded in violation of Batson v. Kentucky,[1] that the State failed to prove that he had not acted in self-defense, and that the court erred in giving an aggressor instruction, admitting his statements in violation of Miranda v. Arizona,[2] constraining his cross-examination of a witness, and violating the prohibition against double jeopardy. In a pro se statement of additional grounds for review, he alleges prosecutorial misconduct during the State's closing argument and ineffective assistance of counsel. We accept the State's concession that Bango's conviction for felony murder should have been vacated and remand for correction of that error. We otherwise affirm.

---

[1] 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).
[2] 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

FACTS

Background

On December 13, 2015, Donald Bango called Curtis Wikstrom to act as a middleman in buying heroin from Jeffrey Shaw. Sometime after midnight, Bango picked up Wikstrom in a rented black sport utility vehicle (SUV). Bango backed the SUV into a space in the parking lot of an apartment building. Bango and Wikstrom talked as they waited for Shaw to arrive, but Bango started to get impatient after about 20 or 25 minutes. Wikstrom testified that Bango cocked a 12-gauge pump shotgun on the floorboard, pointed to an AK-47 in the back seat of the car, and took a pistol from the pocket of his jacket. He told Wikstrom that he had money for the heroin in the glove box, but Wikstrom did not find any money there.

Jesse Neil testified that Shaw asked him for a ride to meet Wikstrom. Before they left Shaw's house, Neil saw Shaw put a gun in his waistband. Neil drove Shaw to the apartment building. Wikstrom asked Bango for the money to pay for the drugs. Bango told Wikstrom to have Shaw come to him. Wikstrom gave Shaw the message and walked back toward the SUV intending to tell Bango to come to Neil's car when he saw Bango pulling on black gloves. Wikstrom was afraid of getting shot, so he ran back to Neil's car, jumped in the back seat, and told Neil to drive away. Neil drove out of the parking lot and started heading back to Shaw's house. Wikstrom told Shaw and Neil that Bango had a lot of guns with him and no money.

Bango immediately started calling Wikstrom's phone. Shaw answered the phone and agreed to meet Bango in a public place but told him that he had a gun. Bango suggested a 7-Eleven near the apartment complex. When they arrived, Bango walked out of the store and approached the passenger side of the car. Bango retrieved a scale from his vehicle, and Shaw placed it on the center console of Neil's car. Shaw weighed the heroin and told Bango to take a look at it. Bango looked in the window, then revealed a badge and told them there were cops all around and to get out of the car. Shaw told Neil that Bango was not a cop and to get out of there. Wikstrom saw Bango reaching for the jacket pocket where he had previously put the pistol and yelled that he was pulling his gun. Neil put the car in reverse and heard gunshots as he was pulling out.

Bango fired two shots, one of which hit Shaw in the chest. Neil sped away and drove directly to the hospital. Neil was sure that Shaw never pulled his gun while they were in the 7-Eleven parking lot because Neil grabbed the gun from Shaw's waistband on the way to the hospital and put it under the driver's seat. Shaw died about 15 minutes after he arrived at the hospital. Officers later recovered a silver and black Kahr .40-caliber semiautomatic pistol from beneath the driver's seat of Neil's car. Bango was charged with first degree murder, second degree murder, criminal impersonation, and witness tampering.

## CrR 3.5 Hearing

The court held a CrR 3.5 hearing before jury selection. Detective Brian Vold and Detective Louise Nist interviewed Bango after his arrest. Vold testified that he began the interview by advising Bango of his Miranda rights. He read through a

standard form used by the Tacoma Police Department and asked for Bango's acknowledgement after each statement. Bango and Nist signed the form. Vold testified that he spent the next part of the interview getting basic personal information from Bango and building rapport while Nist took notes. After about ten minutes, Bango "made an unequivocal request for an attorney." Vold testified that it was his practice to stop an interview after such a request and agreed that he would normally advise the interviewee that they would be transported to the jail. However, Bango rescinded the request within a minute and indicated that he would speak to the detectives. Because of Bango's "back and forth decisions about talking" to the detectives, Vold informed him that the conversation would be recorded from that point on. Vold then began recording and reviewed Bango's Miranda rights again. Bango verbally consented to speak with detectives without an attorney present, and the interview continued for nearly two hours.

Bango testified at the 3.5 hearing that, after he asserted his right to speak with an attorney, Vold informed him that he was going to be arrested, that the SWAT team would have to search his house, and that there "could be implications for [his] wife and children." Bango recalled Vold saying that "DSHS[3] could get involved" if evidence of drug use or sales was found in the house. Bango took this as a threat and agreed to speak with the detectives to avoid involving his family. He denied that he had ever told the detectives that he wanted to waive his rights but admitted to acknowledging his rights and then continuing to answer questions.

---

[3] Washington State Department of Social and Health Services

When recalled as a rebuttal witness, Vold testified that he never suggested to Bango that he would obtain a search warrant for Bango's house, that he would have Bango's wife arrested, or that he would arrange for DSHS to take Bango's children. The court found that the detectives' questioning was cut off as soon as Bango invoked his right to counsel, that no further interrogation occurred after assertion of this right, that the police did not engage in tactics designed to coerce Bango into waiving his right, and that Bango's subsequent waiver was knowing and voluntary. The court admitted the recording of the interrogation with redactions.

Voir Dire

During jury selection, the parties and the court questioned Juror 26 individually. She identified three extended family members who worked in law enforcement. She also reported that her sister had been shot and killed in a nightclub altercation about 40 years before. The shooter had been prosecuted and went to prison. When the court asked if she felt that the system had worked in that case, Juror 26 responded, "Yes. We felt that—the whole family felt that it was fair and just." The court asked if she believed that she could "judge this case simply on the facts and evidence" despite her sister's death, and she responded, "Absolutely." She also described an incident that occurred about 25 years before, just after she had moved to her neighborhood, in which someone called her a racial slur used against African Americans. When she called the police to report the incident, the person on the phone asked if the term offended her, and she was so surprised that she hung up without responding.

Juror 26 is multiracial and lived in Japan and Germany as a child. She described her work as an educator and trainer for a nonprofit that she developed to research and teach the world view of individuals who process and communicate information through more than one cultural frame of reference. The State asked, "How do you think—I mean, it's obviously rather a unique world view, perspective on how you access information. I mean, it sounds like you're taking it from different—you probably see things a little differently than the kid that grew up in Bellevue." She responded, "Well, I would say so," and described an occasion in which a co-worker smelled gasoline and she remarked that it also smelled like kimchee to her. She described this as showing that "you have many ways to look at something."

The State sought to exercise a peremptory strike against Juror 26. Bango raised a Batson[4] challenge, and the court conducted a hearing outside the presence of the jury. Bango argued that Juror 26 was one of only two prospective jurors who appeared to be people of color and the only prospective juror who appeared to be of African American descent. Bango argued that there was nothing in her background that would suggest that she could not be fair and impartial.

The State disagreed with Bango's characterization of the venire, noting that there were at least two other people of color that the State had passed on excluding. The State first noted its concern that "this isn't a good case for this particular juror" because her sister had been murdered. It also noted that Juror 26's comments "about perceptions and how some people perceive things very

---

[4] 476 U.S. 79.

- 6 -

differently than others" suggested that she might be "very forgiving" of Bango's claim of "self-defense based on [his] perception of what he saw." The State also cited the fact that she had "come up with her own words and her own field and her own way to look at the system" as a potential indication that she would be disinclined to follow the rules of the court.

Bango responded that there were two other African Americans in the venire, "one of which we will never get to, just exercising all the peremptories. So essentially she's out of the pool." He argued that there was "nothing in the individual questioning that would lead this Court to believe that she would fail to follow the law or fail to follow the Court's instruction."

The court relied on State v. Rhone[5] to analyze the challenge. The court stated that Juror 26 represented the only person seated on the jury of African American descent. After walking through each of the factors, the court stated that it could not find circumstances to support a Batson challenge. The court did not think that the State had shown a pattern of eliminating jurors of color or had targeted Juror 26 during voir dire "as someone that might be biased towards one party or the other." It did not believe that the strike was biased or discriminatory in nature. The court stated that it could not "infer that based on the exercise of this peremptory alone . . . that the State was doing this purposefully for discriminatory purposes." The court excused Juror 26.

---

[5] 168 Wn.2d 645, 229 P.3d 752 (2010) (plurality opinion), abrogated by City of Seattle v. Erickson, 188 Wn.2d 721, 398 P.3d 1124 (2017).

<u>Trial</u>

During trial, the jury heard Bango's description of the incident through the redacted version of his interview with Vold and Nist. Bango admitted that he was wearing a lanyard around his neck with a badge[6] on it as a "little security policy" to keep him from getting robbed. Bango stated that he approached the passenger window of the car at the 7-Eleven and handed Shaw $294. He saw a gun in the center console of Neil's car that he described as a stainless and black "1911 style Para Ordinance" with writing toward the front of the barrel. While Bango was talking to Shaw, he noticed that Neil had his hand on the gear shift and became concerned that "something [was] getting ready to happen." Bango said he saw Shaw reach for the gun in the console with his left hand, so he pulled out the badge and told them to get out of the car. He said that Shaw pulled the trigger, but the gun did not fire. Bango recalled seeing the hammer move and hearing an audible click. At the same time, Bango fired a shot that hit the door of the car, which then sped out of the parking lot.

The jury heard testimony from Johan Schoeman, a forensic scientist and firearm and tool marks examiner with the Washington State Patrol crime laboratory. Schoeman examined both guns related to this case. He stated that he had tested the Kahr .40 caliber pistol recovered from Neil's vehicle and found it to be fully operable. He did not find any evidence that the gun had misfired. He also testified that the Kahr does not have a visible hammer.

---

[6] The gold badge had the seal of the State of Washington and the words "JRA Transportation Officer" on it. JRA stands for Juvenile Rehabilitation Agency.

Defense counsel sought to elicit testimony from Wikstrom that Bango had shown him pictures of guns on his cell phone and told him that the guns had been stolen from him. The defense argued that the statement was relevant to explain why Bango had displayed the pictures to Wikstrom. The State argued that this was inadmissible hearsay. The court ruled that Bango could testify as to why he showed Wikstrom the pictures but that defense counsel would not be permitted to elicit Bango's explanation from Wikstrom. Bango chose not to testify at trial.

Bango proposed a jury instruction on justifiable homicide. The State proposed an aggressor instruction, to which Bango objected. The court permitted both instructions. The jury was instructed that homicide is justifiable when committed in self-defense, that the law does not impose a duty to retreat, that a person is entitled to act on appearances in defending himself, and that "[n]o person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill, use, offer, or attempt to use force upon or toward another person."

Before the end of the trial, the State filed a third amended information listing the charges as count one: murder in the first degree, count two: murder in the second degree, count three: murder in the second degree while committing or attempting to commit the crimes of assault in the second degree and/or criminal impersonation in the first degree, count four: criminal impersonation in the first degree, and count five: tampering with a witness. The jury found Bango not guilty of murder in the first degree. However, Bango was found guilty on the murder in the second degree charges described in counts two and three of the third amended

information. The jury found that Bango was armed with a firearm when he committed the murder and that he committed or attempted to commit both assault in the second degree and criminal impersonation in the first degree. Bango was also convicted of criminal impersonation in the first degree and tampering with a witness as charged in counts four and five. The court dismissed the felony murder conviction on count three of the charging document.

Post-Trial Proceedings

Days after the jury rendered its verdict, the Washington Supreme Court issued its opinion in City of Seattle v. Erickson.[7] Bango moved for a new trial based on the dismissal of Juror 26 in light of Erickson. The State agreed that the new Erickson test should apply but argued that the court's ruling satisfied the analysis under Erickson. The trial court considered Juror 26 to be of African American descent for purposes of the motion, found that the State had articulated sufficient race-neutral reasons for the strike under the Erickson analysis, and denied the motion for a new trial.

Bango was sentenced to a total of 260 months imprisonment: 200 months on the second degree murder conviction, plus 60 months for the firearm enhancement to run consecutively to the base sentence. The court also imposed 12-month sentences each on the criminal impersonation and witness tampering convictions, to be served concurrently with the murder sentence. Bango appealed.

---

[7] 188 Wn.2d 721, 398 P.3d 1124 (2017).

ANALYSIS

I.      Custodial Statements

First, we address the trial court's admission of statements that Bango made during a police interrogation after he had asserted his right to counsel. He contends that these statements were obtained in violation of his constitutional right to an attorney and should have been excluded.

Challenged findings of fact entered after a CrR 3.5 hearing will be upheld if they are supported by substantial evidence in the record. State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). "'Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.'" State v. Wilson, 144 Wn. App. 166, 183, 181 P.3d 887 (2008) (quoting State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994)). We treat unchallenged findings of fact as verities on appeal. State v. Elkins, 188 Wn. App. 386, 396, 353 P.3d 648 (2015). We then determine de novo whether the findings support the trial court's conclusions of law. Id. at 396–97. Credibility determinations cannot be reviewed on appeal. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

First, Bango contends that the court erred in finding that police did not engage in tactics designed to coerce him into waiving his rights. Both detectives testified that they did not threaten or coerce Bango into continuing the interview without an attorney present. Although Vold admitted that he had likely informed Bango that he would be arrested and transferred to the jail while his request for an attorney was pending, he denied making comments about searching Bango's

- 11 -

house, arresting his wife, or removing his children. Despite Bango's testimony to the contrary, substantial evidence exists in the record to support the finding of fact that the police did not engage in coercive tactics.

Bango also challenges the court's conclusion that his statements were admissible. The State bears the burden to demonstrate by a preponderance of the evidence that a suspect knowingly and intelligently waived his Miranda rights before it may introduce incriminating statements made during a custodial interrogation. State v. Mayer, 184 Wn.2d 548, 556, 362 P.3d 745 (2015); State v. Radcliffe, 164 Wn.2d 900, 905–06, 194 P.3d 250 (2008). Signing a standard waiver of rights form is not determinative evidence of waiver but "it 'is usually strong proof of the validity of that waiver.'" State v. Woods, 34 Wn. App. 750, 759, 665 P.2d 895 (1983) (quoting North Carolina v. Butler, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)). Waiver may also be inferred under certain facts and circumstances even if not explicit. Id. at 759–60.

Here, the court found that the detectives scrupulously honored Bango's invocation of his rights and no further interrogation took place after that point, that the detectives did not coerce Bango's waiver, and that the subsequent signed waiver of his rights was knowing and voluntary. These findings support the conclusion that the State was permitted to introduce Bango's statements made during the interrogation.

Bango next argues that we should either recognize a constitutional due process right or adopt an evidence rule requiring interrogations to be electronically recorded in their entirety to be admissible. This court has squarely rejected the

argument that there is a due process right under the Washington Constitution requiring electronic recording of custodial police interrogations. See State v. Turner, 145 Wn. App. 899, 911, 187 P.3d 835 (2008). Bango contends that the implementation of body cameras for law enforcement officers since State v. Turner warrants reconsideration of this issue. However, as the State points out, the Washington Supreme Court considered and rejected a proposed court rule that would have required recording of "[c]ustodial and non-custodial interrogations of persons under investigation for any crime" in 2019.[8] We decline to consider this issue.

II.     Peremptory Challenge

Bango contends that his right to equal protection under the Fourteenth Amendment of the United States Constitution was violated because the State improperly employed a peremptory strike to exclude the only other juror of his race.

"[T]he Equal Protection Clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race." Powers v. Ohio, 499 U.S. 400, 409, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). The United States Supreme Court established a three-part test to determine whether a party improperly used a peremptory strike to exclude a potential juror based on race. Batson, 476 U.S. at 93–94. First, the party challenging the exercise of the peremptory strike bears the

---

[8] Wash. State Admin. Office of the Cts., Washington State Court Rules Archive, http://www.courts.wa.gov/court_rules/?fa=court_rules.archivelist (last visited Dec. 18, 2020); Suggested New Criminal Rule CrR 3.7 Recording Interrogations, available at http://www.courts.wa.gov/court_rules/?fa=court_rules.proposedRuleDisplay&ruleId=669 (last visited Dec. 18, 2020).

burden of establishing a prima facie showing of purposeful discrimination. Id. at 93–94, 96. If such a showing is made, the burden shifts to the challenged party to give a race-neutral explanation for the strike. Id. at 97. The court then weighs all of the circumstances to determine whether the strike was racially motivated. Id. at 98.

The Washington Supreme Court has noted that "[t]he Batson framework anticipates that state procedures will vary, explicitly granting states flexibility to fulfill the promise of equal protection." State v. Saintcalle, 178 Wn.2d 34, 51, 309 P.3d 326 (2013), abrogated on other grounds by Erickson, 188 Wn.2d 721. Although the court had held that a trial court did not err in finding a prima facie showing of discrimination when a party sought to strike the last member of a racial or ethnic group from a jury, the court declined for many years to adopt a bright-line rule that such a strike would always constitute a prima facie case. See State v. Hicks, 163 Wn.2d 477, 491–92, 181 P.3d 831 (2008); Rhone, 168 Wn.2d at 653–54. However, soon after Bango was convicted, the Washington Supreme Court decided Erickson, which affected the first step of the Batson framework. Erickson, 188 Wn.2d 721. The Erickson court adopted the bright-line rule that a prima facie showing of discrimination is automatically made if a party strikes the only member of a cognizable racial group from the jury. Id. at 734.

In 2018, the Washington Supreme Court announced a change to the third step of the Batson framework in State v. Jefferson. 192 Wn.2d 225, 429 P.3d 467 (2018). The Jefferson court held that the relevant question for courts to answer in

the third step of the Batson inquiry is whether an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge. Id. at 249.

A trial court's findings regarding the prima facie showing of discrimination have traditionally been reviewed for an abuse of discretion. Erickson, 188 Wn.2d at 730. Under the old Batson framework, appellate courts reviewed a trial court's ruling on a Batson challenge for clear error. Jefferson, 192 Wn.2d at 250. However, when the Supreme Court altered the third step of the analysis in Jefferson, it also determined that the new, objective test would be reviewed de novo. Id.[9]

Appellate courts have cautioned that trial courts should attempt to keep the three phases of the analysis separate so as not to "collapse" the Batson analysis. State v. Wright, 78 Wn. App. 93, 100–01, 896 P.2d 713 (1995). However, if the striking party offers a race-neutral reason for the challenge and the trial court rules on the ultimate question of racial motivation, then the reviewing court need not determine whether the prima facie showing of discrimination was established. Hicks, 163 Wn.2d at 492–93. Even if the striking party gives a race-neutral explanation for the record, "such an offer of proof would not render the issue of whether a prima facie case exists moot." Wright, 78 Wn. App. at 101. This issue is mooted only if "'the trial court has ruled on the ultimate question of intentional

---

[9] The State characterizes Jefferson as "a GR 37 case" and argues that the standard of review "remains clearly erroneous, giving great deference to the trial judge." However, the Washington Supreme Court found that it could not apply GR 37 to the Batson challenge in Jefferson because the rule was not yet effective at the time voir dire was completed. Jefferson, 192 Wn.2d at 249. Instead, the court "address[ed] the problems with step three of the Batson test directly" and modified the third step of the Batson analysis to conform with the requirements of GR 37. Id. at 249–50. In doing so, the court applied a de novo standard of review, noting that it was "a change from Batson's deferential, 'clearly erroneous' standard of review." Id.

discrimination.'" Hicks, 163 Wn.2d at 492 (quoting Hernandez v. New York, 500 U.S. 352, 359, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991)). Because the prima facie showing is unnecessary if the judge ruled on the question of racial motivation, we first consider whether the trial court ruled on this ultimate question.

After Bango made his objection to the State's attempted strike, the court allowed the State to present its race-neutral explanation for the strike. The court then conducted an analysis based on Rhone. The Rhone court considered only whether the appellant had established a prima facie case of discrimination. Id. at 655. The Washington Supreme Court declined to adopt the bright-line rule, later accepted in Erickson, that striking the last member of a cognizable racial group automatically led to an inference of discrimination. Id. Instead, Rhone cited Batson for the proposition that the party challenging a strike must show that the use of the peremptory challenge and "something more" raised the inference of discrimination. Id. Rhone listed eight examples of relevant circumstances to consider when determining whether the challenging party had established such an inference. Id. at 656.

Here, the court considered the circumstances listed in Rhone when performing its analysis. Because these factors were used pre-Erickson to determine whether a prima facie showing of discrimination had been made, if the court based its ruling on those factors alone, it follows that the ruling would concern only the prima facie showing, not the ultimate issue of racial motivation. It is not abundantly clear from the trial transcript whether the court intended to rule on only the first step of the analysis or on the ultimate issue. However, despite the court's

reliance on the Rhone factors in its analysis, its oral ruling suggested that it was deciding the ultimate issue of intentional discrimination:

> "I don't think the State has shown a pattern of exercising their discretion to purposefully eliminate minorities. I don't think that during either the general questioning or the individual questioning, that [Juror 26] was targeted by the State as someone that might be biased towards one party or the other. I feel that they have their own reason for wanting her off the jury. I don't believe it is a bias or discriminatory in nature. It may be that they just simply don't agree with her world view of things and their concern about sympathy or prejudice that she may have towards a defendant, whether black, white or any minority or race. And I can't infer that based on the exercise of this peremptory alone, that there are any other—that there's something more that the Court can hang its hat on that would say that the State was doing this purposefully for discriminatory purposes. And I can't make that inference on what has happened up to this point in time."

The court's later statements also support the conclusion that its ruling concerned the ultimate issue. During oral argument on the motion for a new trial, the trial judge stated that he recalled conducting "a [Batson] analysis even though [he] felt there wasn't a . . . prima facie case." The State agreed with this characterization of the previous decision and stated that, for the purposes of the Erickson analysis, "the Court should probably find a prima facie showing has been made" and, "for the sake of argument, the State would stipulate to that step." In its order denying the motion for a new trial, the court stated that, when ruling on the initial motion to strike the peremptory challenge, it "did not find that there was a prima facie case of racial discrimination," but, "despite this finding, the Court engaged in an analysis as if that test had been met."

Considering the court's ruling and the surrounding context, it appears that the court intended to rule on the ultimate issue of intentional discrimination.

Accordingly, the issue of whether Bango established a prima facie showing of discrimination is moot under Hicks, and we need not apply the modified rule from Erickson to the first step of the Batson analysis in this case.

Accordingly, we turn to the court's determination regarding racial motivation. The State concedes that the rule from Jefferson applies to cases that were pending on appeal when Jefferson was decided, which includes this case. Therefore, we apply the modified test from Jefferson and assess whether an objective observer could view race or ethnicity as a factor in the strike. The relevant objective observer for this analysis "is aware of the history of explicit race discrimination in America and aware of how that impacts our current decision making in nonexplicit, or implicit, unstated, ways." Jefferson, 192 Wn.2d at 249–50. In Jefferson, the court found that the proffered race-neutral reasons for striking the sole African American juror were not supported by the record, which reflected differential treatment of that juror and could support an inference of implicit bias. Id. at 250–51.

In this case, an objective observer would not view Juror 26's race or ethnicity as a factor in the strike. The record does not reflect differential treatment of Juror 26. The State cited the fact that the juror's sister was a murder victim as one reason for the strike. Similarly, defense counsel used a peremptory strike against Juror 12, whose relative had been convicted of felony murder, even though Juror 12 stated that he believed he could separate that incident from the current situation. Despite the different roles occupied by the prospective jurors' relatives, both the prosecutor and defense counsel could reasonably have concluded that a

family member's prior involvement in a murder could consciously or unconsciously affect a juror's ability to be objective in a murder trial.

Although the questioning regarding the nature of Juror 26's work was unique among the potential jurors, this discrepancy is unsurprising given that she created her own field of study. The State argued that her scholarship suggested that she might be more forgiving of alternate perceptions than the average person. This was an especially important consideration because Bango claimed he acted in self-defense, which made his perception of the incident pivotal. The singular nature of her field set her apart regardless of race, and the State's justifications carried none of the historical hallmarks of improper discrimination. See, e.g., GR 37(h), (i).[10] An objective observer would not view race as a factor in the strike.

III.    Limitation of Wikstrom's Testimony

Next, Bango contends that his right to a fair trial was violated when the court allowed the State to question Wikstrom about the photographs that Bango had shown him but denied defense counsel the opportunity to cross-examine Wikstrom about why Bango showed him the photographs. Bango argues that the evidence was relevant to rebut the State's theory that he "was intimidating Wikstrom in preparation for a robbery." A trial court's evidentiary rulings are reviewed for an abuse of discretion. State v. Finch, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). A

---

[10] As the State notes, GR 37 was not yet in effect at the time of Bango's trial and does not apply to this case. See Jefferson, 192 Wn.2d at 249 ("[W]e hold that GR 37 applies prospectively to all trials occurring after GR 37's April 24, 2018 effective date. But because the 'triggering event' for its application was voir dire, we cannot apply GR 37 to the completed Batson challenge in this case.").

court abuses its discretion when its decision is based on untenable grounds or reasons. Id.

All relevant evidence is admissible except as limited by constitutional requirements, statutes, rules, or regulations. ER 402. Hearsay evidence is generally inadmissible unless allowed by the rules of evidence, other court rules, or statute. ER 802. Hearsay is defined as an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). An out-of-court statement made by a party is not hearsay if it is offered against the speaker. ER 801(d)(2). However, if the out-of-court statement by a party is self-serving and tends to aid that party's case, it is not admissible under this exception. Finch, 137 Wn.2d at 824. "The problem with allowing such testimony is that it places the defendant's version of the facts before the jury without subjecting the defendant to cross-examination." Id. at 825.

Here, defense counsel sought to introduce statements made by Bango to Wikstrom for their truth. These statements would have been offered to aid Bango's case by providing an alternative reason that Bango showed Wikstrom the photographs other than the State's theory that the photographs were an intimidation tactic. Therefore, the evidence was inadmissible hearsay. The court did not abuse its discretion in excluding this evidence.

IV.    Aggressor Instruction

Bango also argues that the trial court erred in giving an aggressor instruction. Appellate courts review challenged aggressor instructions using the same standards applied to other jury instructions on review. State v. Grott, 195

- 20 -

Wn.2d 256, 270, 458 P.3d 750 (2020). Jury instructions are sufficient when they are supported by substantial evidence, permit the parties to argue their theories of the case, and, when read as a whole, properly inform the jury of the applicable law. State v. Woods, 138 Wn. App. 191, 196, 156 P.3d 309 (2007). Self-defense instructions are subject to heightened scrutiny, and the jury instructions must make the law of self-defense "'manifestly apparent to the average juror'" when read as a whole. Id. (quoting State v. Walden, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997)). Appellate courts review de novo whether the State produced sufficient evidence to justify an aggressor instruction. State v. Sullivan, 196 Wn. App. 277, 289, 383 P.3d 574 (2016). On appeal, we view the evidence in the light most favorable to the party who requested the instruction. State v. Bea, 162 Wn. App. 570, 577, 254 P.3d 948 (2011).

Generally, the right of self-defense cannot be invoked successfully by an aggressor in an altercation. State v. Riley, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). An instruction informing the jury of this principle is appropriate where there is credible evidence from which the jury could reasonably determine that the defendant provoked the need to act in self-defense. Id. at 909–10. If there is conflicting evidence as to whether the defendant's conduct precipitated a confrontation, the aggressor instruction is appropriate. Id. at 910. The Washington Supreme Court has cautioned that "'courts should use care in giving an aggressor instruction,'" but should give the instruction when called for by the evidence. Grott, 195 Wn.2d at 270 (quoting Riley, 137 Wn.2d at 910 n.2). "[A]ggressor instructions are disfavored only where they are not justified." Id. at 271.

Words alone do not constitute sufficient provocation to warrant an aggressor instruction. Riley, 137 Wn.2d at 910–11. This is so because the victim cannot lawfully respond with force to a defendant's use of words alone. State v. Kee, 6 Wn. App. 2d 874, 879, 431 P.3d 1080 (2018). However, "where there is evidence that the defendant engaged in a course of aggressive conduct, rather than a single aggressive act, 'the provoking act can be part of that "single course of conduct."'" Grott, 195 Wn.2d at 273 (emphasis omitted) (quoting Sullivan, 196 Wn. App. at 290). For example, Division Three of this court has found that a defendant's conduct "consisted of more than words" and an aggressor instruction was warranted when the defendant was yelling and leaning over another person with his hands on the arms of the chair that she was sitting in. State v. Anderson, 144 Wn. App. 85, 89–90, 180 P.3d 885 (2008).

Here, the State argued that the aggressor instruction was appropriate because "a jury could conclude that [Bango] pulling the badge . . . resulted in [Neil] throwing the car into reverse and Mr. Shaw grabbing for the gun and the defendant then shooting him. Or that the defendant started this whole process by pulling the badge and instigating a robbery." The State contends that the display of the badge and demand that everyone get out of the car, viewed in the context of Bango's other actions that night, constituted an aggressive act because it indicated that Bango was commencing the robbery.

Viewed in the light most favorable to the State, the evidence was sufficient to support the aggressor instruction. The State produced evidence that Bango had come to the drug deal with multiple guns and no money, that Wikstrom feared

Bango would start shooting when he saw him pulling on tactical gloves, and that Bango asked to enter Neil's car at the 7-Eleven. A jury could conclude that Bango's display of the badge and demand that they exit the car was the final step in a robbery.

Even if the aggressor instruction was warranted, Bango argues that the court erred in giving the instruction without also instructing the jury that words alone were insufficient to constitute provocation. "When there is evidence that the defendant provoked an altercation with words, particularly when the State suggests that those words constitute first aggression, the language of WPIC 16.04 is inadequate to convey the law established in Riley." Kee, 6 Wn. App. 2d at 882. In State v. Kee, Division Two of this court concluded that the trial court failed to make the law of self-defense manifestly apparent when it did not convey this rule to the jury and the State argued that the defendant had initiated the confrontation by speaking to the victim. Id. at 880–82.

Although this situation is similar to Kee, here, the court did not err in failing to instruct the jury that words alone are not adequate provocation. The State does not appear to have argued that Bango's demand to get out of the car alone constituted an act of aggression. As noted above, the State's theory was that Bango's attempt to rob Shaw precipitated any need to act in self-defense. The court did not err in instructing the jury.

V.    Sufficiency of the Evidence

Bango argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. "A claim of insufficiency admits the truth of the

- 23 -

State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). When a defendant challenges the sufficiency of the evidence in a criminal case, we draw all reasonable inferences from the evidence in favor of the State and against the defendant. Id. The evidence is sufficient if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Id. We "must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874–75, 83 P.3d 970 (2004).

Viewed in the light most favorable to the State, the evidence was sufficient to prove that Bango did not act in self-defense. Although Bango claimed that he saw and heard Shaw pull the trigger of his gun, Neil and Wikstrom both testified that Shaw never drew his gun from the waistband of his pants. The State also produced evidence that Shaw's gun did not show signs of a misfire and did not have a visible hammer, despite Bango's assertion that he saw the gun's hammer move. Based on this testimony, a rational trier of fact could conclude beyond a reasonable doubt that Bango was not acting in self-defense when he shot Shaw.

VI.    Double Jeopardy

Bango contends that the trial court erred when it dismissed but did not vacate his conviction for felony murder. He argues that the court's failure to vacate the conviction amounts to a violation of his constitutional right to be free from double jeopardy. At oral argument, the State conceded error and asked this court

- 24 -

to remand for vacation of the dismissed conviction. We accept the State's concession and remand.

VII.    Statement of Additional Grounds for Review

A.    Prosecutorial Misconduct

In a pro se statement of additional grounds for review, Bango contends that multiple instances of prosecutorial misconduct during the State's closing argument individually and collectively deprived him of a fair trial.

A defendant claiming prosecutorial misconduct must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire trial. State v. Walker, 182 Wn.2d 463, 477, 341 P.3d 976 (2015). We view allegedly improper statements in the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions. State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). The conduct is prejudicial if the defendant shows a substantial likelihood that the misconduct affected the jury's verdict. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).

When the objection is raised for the first time on appeal, the appellant "must also show 'that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice.'" Walker, 182 Wn.2d at 477–78 (quoting Glasmann, 175 Wn.2d at 704). We focus not on the prosecutor's subjective intent but "on whether the defendant received a fair trial in light of the prejudice caused by the violation of existing prosecutorial standards and whether that prejudice

could have been cured with a timely objection." Id. at 478.  A closing argument provides

> an opportunity to draw the jury's attention to the evidence presented, but it does not give a prosecutor the right to present altered versions of admitted evidence to support the State's theory of the case, to present derogatory depictions of the defendant, or to express personal opinions on the defendant's guilt.

Id.

### 1.  State's Slideshow During Closing Argument

Bango first argues that the State committed prosecutorial misconduct when it presented a slideshow to the jury during closing argument that contained "pictures that were admitted into evidence that were altered with captions."

Defense counsel requested a copy of the State's slides before closing argument so that any objections could be made before the slides were shown to the jury.  The court stated that it would review the slides before closing argument but did not intend to show them to defense counsel.  After reviewing the slides, the court ordered the State to strike the heading "murder in the underworld" from one of its slides and to strike the phrase "defendant's greed" from another.  The court permitted the statement that "greed for drugs, greed for money cost Jeffrey Shaw his life."  Bango objected to these remaining phrases, but the court felt that the edited version of the slide was neutral.

Bango contends that the captions added to the admitted exhibits displayed in slides 5 and 6 impermissibly altered the evidence.  Slide 5 showed an image of the bullet hole in the passenger door of Neil's car with the caption, "Defendant shot

at Jeffrey once." The next slide showed an autopsy photo of the bullet wound in Shaw's torso with the caption, "And twice."

In State v. Walker, the Washington Supreme Court found that "[t]he prosecution committed serious misconduct" when it presented a slideshow during closing argument that:

> [I]ncluded multiple exhibits that were altered with inflammatory captions and superimposed text; it suggested to the jury that Walker should be convicted because he is a callous and greedy person who spent the robbery proceeds on video games and lobster; it plainly juxtaposed photographs of the victim with photographs of Walker and his family, some altered with racially inflammatory text; and it repeatedly and emphatically expressed a personal opinion on Walker's guilt.

182 Wn.2d at 478 (emphasis omitted). Bango also cites In re Personal Restraint of Glasmann, in which the defendant's booking photograph, which had been admitted into evidence, was featured in at least five slides in the State's closing argument, with captions reading "DO YOU BELIEVE HIM?" and "WHY SHOULD YOU BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?" and, near the end of the presentation, with the word "GUILTY" superimposed over the image multiple times in red letters. 175 Wn.2d at 701–02. The court found that "the prosecutor's modification of photographs by adding captions was the equivalent of unadmitted evidence." Id. at 706.

Here, the captions "Defendant shot at Jeffrey once," and "And twice," were not nearly as inflammatory as those in Walker and Glasmann. There had been testimony that Bango fired two shots, one that hit the passenger door of Neil's car and one that hit Shaw in the chest. Unlike Glasmann, the captions were not the

equivalent of adding unadmitted evidence. The use of these slides does not constitute misconduct.

Bango also challenges slide 90:

He argues that the use of the phrase "defendant's greed" in this slide and in the prosecutor's verbal argument after the court had stricken the phrase from another slide constituted misconduct. Bango did not object when the prosecutor used this term orally or when slide 90 was shown to the jury.

Even if the prosecutor's use of this phrase was improper, Bango cannot show prejudice. The State's theory of the case was that Bango set up the deal intending to rob Shaw. Explicitly stating that greed was the motivation for a robbery is unlikely to sway a jury. Bango has not shown misconduct.

2. Opinion on Bango's Guilt

Bango also argues that the State committed prosecutorial misconduct in closing argument because it presented numerous slides with the word "guilty" on them. He contends that these communicated the prosecutor's individual opinion of his guilt to the jury.

"Attorneys may use multimedia resources in closing arguments to summarize and highlight relevant evidence" as well as reasonable inferences from the evidence. Walker, 182 Wn.2d at 476–77. However, "a prosecutor cannot use his or her position of power and prestige to sway the jury and may not express an individual opinion of the defendant's guilt, independent of the evidence actually in the case." Glasmann, 175 Wn.2d at 706. This court relied on Glasmann when finding similar tactics to be flagrant misconduct:

> The slides of Hecht's photograph with a large red "GUILTY" printed across his face were at odds with the prosecutor's duty to ensure a fair trial. No legitimate purpose is served by a prosecutor showing the jury a defendant's photograph with the word "GUILTY" superimposed over his face. Such images are the graphic equivalent of shouting "GUILTY." "A prosecutor could never shout in closing argument that '[the defendant] is guilty, guilty, guilty!' and it would be highly prejudicial to do so."

State v. Hecht, 179 Wn. App. 497, 505, 319 P.3d 836 (2014) (quoting Glasmann, 175 Wn.2d at 709). Even though the prosecutor's use of Hecht's driver's license photo was "arguably less severe" than the booking photo used in Glasmann, this court found that the graphics remained "clearly improper." Id. at 506. The visual presentation of the word "guilty" also influenced the court's conclusion: "the prejudicial impact of the word 'GUILTY' was magnified by the fact it was written in capital letters, in red, and on a diagonal, obvious graphic devices for drawing the eye, implying urgency of action, and evoking emotion." Id. The court was not swayed by the fact that "the prosecutor's verbal argument was largely temperate" because it did not "diminish the dramatic impact of the improper graphics" that "unfairly injected inflammatory extrinsic considerations into the argument." Id.

- 29 -

Bango objects to slides 76, 79, 83, 85, 87, 89, and 96 of the State's presentation:



In the context of the State's verbal argument, it is clear that the prosecutor was not expressing a personal opinion of Bango's guilt. Rather, she was arguing that the State had met its burden of proving each of the charges beyond a reasonable

doubt based on the evidence and reasonable inferences from the evidence. Although the word "guilty" appears repeatedly, the presentation is considerably less dramatic than the slides in Glasmann and Hecht. Bango has not shown misconduct.

### 3. Misstatement of the Law of Self-Defense

Bango next contends that the prosecutor committed misconduct by misstating the law and presenting the jury with a "false choice" during closing argument. While discussing justifiable homicide, the prosecutor stated, "To believe homicide was justified, to believe this was self-defense, you'd have to take Mr. Bango's word as to whether or not [Shaw] pointed a gun and pulled the trigger." Bango identifies slide 61 of the State's slide show as objectionable:

He contends that these statements improperly shifted the State's burden by presenting the jury with the false choice that they could "find the defendant not guilty only if they believe his or her evidence or only if they believe the victim (State's witness) lied or was mistaken." Although Bango objected at trial to the explanation of justifiable homicide in slide 59 as a misstatement of the law, he did not raise an objection to slide 61.

"Although prosecutors have 'wide latitude' to make inferences about witness credibility, it is flagrant misconduct to shift the burden of proof to the defendant." State v. Miles, 139 Wn. App. 879, 890, 162 P.3d 1169 (2007) (quoting State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)). It is a misstatement of the law and a misrepresentation of the role of the jury and the burden of proof for the prosecutor to argue that, to acquit a defendant, the jury must find that the State's witnesses are either lying or mistaken. See State v. Fleming, 83 Wn. App. 209, 213, 921 P.2d 1076 (1996).

In State v. Fleming, this court found that the prosecutor misstated the law and misrepresented the role of the jury and the burden of proof when they argued to the jury in closing:

> [F]or you to find the defendants, Derek Lee and Dwight Fleming, not guilty of the crime of rape in the second degree, with which each of them have been charged, based on the unequivocal testimony of [D.S.] as to what occurred to her back in her bedroom that night, you would have to find either that [D.S.] has lied about what occurred in that bedroom or that she was confused; essentially that she fantasized what occurred back in that bedroom.

Id. at 213 (alteration in original) (emphasis omitted). In State v. Miles, Division Two of this court found misconduct when the prosecutor argued that the State's and defendant's versions of events were mutually exclusive and that the jury had to choose whether the State's witnesses or the defense witnesses were correct:

> [T]o the extent the prosecutor's argument presented the jurors with a false choice, that they could find Miles not guilty only if they believed his evidence, it was misconduct. The jury was entitled to conclude that it did not necessarily believe Miles and Bell, but it was also not satisfied beyond a reasonable doubt that Miles was the person who sold the drugs to Wilmoth.

139 Wn. App. at 889–90.

Here, the prosecutor argued that the jury had to believe that Shaw tried to shoot at Bango to find that the homicide was justified:

> The State has the burden of proving beyond a reasonable doubt that the homicide was not justified. And if you find we have not, then it's your duty to return a verdict of not guilty. But, ladies and gentlemen, we have disproved justifiable homicide in this case and here's why. To believe homicide was justified, to believe this was self-defense, you'd have to take Mr. Bango's word as to whether or not the defendant pointed a gun and pulled the trigger.

Although this is a closer case than Miles or Fleming, in context, the State's argument here did not rise to the level of flagrant misconduct. The prosecutor explicitly acknowledged that the State had the burden to prove that Bango had not acted in self-defense. Read in context, the prosecutor's statement appears to be pointing out that there was no evidence apart from "Mr. Bango's word" that Shaw had pointed a gun at him and pulled the trigger. Bango has not shown that the prosecutor committed flagrant misconduct by misstating the law.

### B. Ineffective Assistance of Counsel

Next, Bango contends that he received ineffective assistance when his attorney failed to object or renew an objection to the alleged instances of prosecutorial misconduct in the State's closing argument. Specifically, Bango alleges that his trial counsel should have objected to slides 5 and 6 of the State's slideshow, the prosecutor's opinion of guilt, the prosecutor's comment that a defense witness was biased, and the prosecutor's comment to the jury to "hold [the] defendant accountable."

A criminal defendant has the right to effective assistance of counsel under both the state and federal constitutions. Strickland v. Washington, 466 U.S. 668,

686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Jones, 183 Wn.2d 327, 339, 352 P.3d 776 (2015). To prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that the deficient performance was prejudicial. Jones, 183 Wn.2d at 339.

Because we find no misconduct concerning slides 5 and 6 or the prosecutor's use of the word "guilty" in the slideshow, Bango cannot show that his counsel's performance was deficient in failing to object to this material. Bango has not shown that he received ineffective assistance when his attorney failed to object to the slides.

When reviewing the evidence in closing, the prosecutor commented on Bango's witness:

> His witness, George Niera, seemed—very nice person. Here it's clear he's the defendant's friend. He's biased. No disrespect to him. Consider what he told you. He wants you to believe that he and the defendant have engaged in the same training. He didn't attend the same training at the same time with the defendant, but he wants to convince you, to perhaps convince himself, the defendant acted accordingly with their training. And recall that Mr. Niera—no malintent—no one's suggesting he's trying to mislead anyone, but what all has he truly reviewed?

Bango's attorney did not object.

Bango does not provide any authority showing that this argument was objectionable, nor is relevant case law evident. Generally, "[t]he State has wide latitude in drawing and expressing reasonable inferences from the evidence, including inferences about credibility" in closing argument. State v. Rodriguez-Perez, 1 Wn. App. 2d 448, 458, 406 P.3d 658 (2017). Bango has not shown that his attorney's failure to object to this argument constituted deficient performance.

In its rebuttal, the State concluded with the following:

[C]ounsel wants you to believe it's just the State throwing stuff against the wall and hoping something sticks. No. Hold him accountable. The fact that he's guilty of three different versions, the fact that he committed murder in three different ways is not the State throwing it against the wall. It's the State insisting that he be held accountable for what he did. I ask you to do that and convict Donald Bango.

Again, Bango's attorney did not object.

Similarly, Bango does not point to any authority showing that his counsel's failure to object to this statement constituted deficient performance. This court has found that there was not "anything improper with stating that the defendant will be set free or held to account by a jury's decision; that is indeed the jury's responsibility and function." State v. McNallie, 64 Wn. App. 101, 111, 823 P.2d 1122 (1992). Bango has not shown that he received ineffective assistance for failure to object to this statement.[11]

---

[11] Bango also contends that he received ineffective assistance when his trial counsel failed to investigate his mental health history and diagnoses as a possible foundation for a diminished capacity defense. Because Bango's allegation of ineffective assistance appears to concern facts outside the record before this court, we decline to reach this issue. See State v. Calvin, 176 Wn. App. 1, 26, 316 P.3d 496 (2013).

Affirmed in part, remanded for vacation of Bango's felony murder conviction.[12]

WE CONCUR:

---

---

[12] Bango also argues in his Statement of Additional Grounds for review that the court erred in excluding evidence of Shaw's reputation and prior convictions. The court denied the State's request to exclude this evidence but required Bango to "make an offer of proof via the witness outside the presence of the jury before introducing such evidence." The exclusion that Bango alleges was error does not appear to have taken place. Because this additional ground does not adequately inform the court of the nature and occurrence of the alleged errors, we decline to review it. See Calvin, 176 Wn. App. at 26.